[Crim. No. 7287. Second Dist., Div. Two. Sept. 24, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD FRANK STADNICK et al., Defendants and Appellants.

Ernest L. Graves, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk, Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Appellants Edward F. Stadnick and Zella Mae Snyder appeal from judgments convicting them of first degree robbery in violation of section 211 of the Penal Code; they also appeal from the orders denying their motions for new trials.

Initially, appellants were charged in a four-count information with a codefendant, Timothy M. Burke. Count One charged that appellant Stadnick and Burke had robbed one John Hamlinn of $165 on January 9, 1960, and that at the time of the commission of the offense they were armed with a .380 Belgium Automatic Pistol. Count Two charged that appellants Snyder and Burke robbed one Mary G. Sparks of $20 on January 10, 1960, while similarly armed. In the third and fourth counts, the codefendant Burke was separately charged with two additional robberies on January 10, 1960. Appellant Stadnick also was charged with two prior felony convictions which he admitted. Following the selection of a jury, the codefendant Burke, who was separately repre-

sented by counsel other than counsel representing appellants, changed his plea to guilty to all counts. The matter then proceeded to trial on the remaining counts involving appellants; it resulted in verdicts that appellants were guilty of first degree robbery "as charged in the information." Appellants were sentenced to state prison for the terms prescribed by law.

The evidence of the Hamlinn robbery consisted of the testimony of the victim that on the night in question Burke entered the liquor store where he was employed and ordered a bottle of vodka. The witness turned, took a bottle from the shelf, and when he turned again to face the counter, he noticed that Burke had a gun in his hand and that appellant Stadnick was standing beside him. Burke demanded that the witness hand over all the money. The witness removed the money from the cash register and when Stadnick, who was closest to him, held out his hand, the witness placed the money in it. Stadnick then went behind the counter and checked the cash register drawer for a false bottom. Burke, who had kept the gun aimed at the witness during these proceedings, asked whether there was any more money; the witness thereupon produced some change from under the counter and handed it to Burke. Burke then directed the witness to the rear of the store and Stadnick remarked, "Don't worry. We won't hurt you. Just do as you are told and everything will be all right." Burke held the witness at gun point for a few minutes at the rear of the store while Stadnick left. Burke left the store with a warning to the witness not to follow him.

Appellant Stadnick did not testify, but Burke was called as a witness on his behalf. He testified in substance: that he had known Stadnick for some two years; that they lived together; that they drove to the store together and left together; but that Stadnick had been unaware of Burke's sudden decision to rob the store and had not participated therein. Burke further testified that although Stadnick was "very angry" about the robbery, he had accepted $50 of the loot in payment of certain "arrearages in rent." Burke explained his being in arrears in his rent, despite the very substantial proceeds of some eighteen previous robberies committed by him, by stating that he spent money "pretty quick." Burke also indicated that Stadnick knew of his possession of the gun.

The evidence as to the Sparks robbery was the testimony of the victim that she was alone in the small grocery store where she worked when she noticed appellant Snyder

at the bread counter. Some conversation was had in which Snyder asked, ''Is there anything fresh in here besides you?'' She then noticed Burke at the counter holding a gun on her. She gave him all the money she had. Snyder moved toward her during this transaction. A customer then entered, and at Burke's direction, she waited on him and he left. Snyder drew even nearer the witness while the customer was in the store. Burke then told her to go into the back room. She did so and ''Mrs. Snyder followed me back there and she and he closed the door.'' When the witness emerged from the rear room Mrs. Snyder and Burke had gone.

Burke also testified on behalf of appellant Snyder, and again stated that, although he had known her for some time, and in fact they and others had been drinking at his apartment the previous night, (after the Hamlinn robbery above described) she was unaware of his sudden decision to rob the grocery store and had not participated therein. It is not entirely clear from the record whether Snyder shared the apartment with Burke and Stadnick, but it would have been a reasonable inference from the evidence that she did. When she took the stand in her own behalf, she testified that ''*they* wanted me to fix something to eat, and having been drinking I decided upon sandwiches, and there wasn't any bread, so I went to the store to get some bread.'' (Emphasis added.) Later, however, she stated that no one had told her to go, that she ''just decided'' she was going to make sandwiches for herself, ''the baby and Jake.'' However, although she returned to the apartment after the robbery, she did not make any sandwiches or tell Jake of the robbery, but simply told him to watch the baby as she ''wouldn't be around to care for her.'' She then left, went to a bar and resumed her drinking. She was later arrested and returned to the store where she was definitely identified by the victim.

Appellants' first assignment of error is that the evidence is insufficient to sustain the verdicts. Manifestly, this contention is completely without merit. Section 31 of the Penal Code provides that ''*All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.*'' (Emphasis added.)

While the mere presence of an accused at the scene of a crime is not alone sufficient to make him a participant, nor is he guilty merely because he does not act to prevent it, his presence *is* a circumstance tending to support a finding

that he is a principal and may be considered by the jury with evidence of his companionship with the principal and of his conduct before and after the offense. (*People* v. *Mauldin,* 181 Cal.App.2d 184, 189 [5 Cal.Rptr. 243] ; *People* v. *Carlson,* 177 Cal.App.2d 201, 205 [2 Cal.Rptr. 117] ; *People* v. *Moore,* 120 Cal.App.2d 303, 306 [260 P.2d 1011].) An accused who, in the commission of first degree robbery, aids and abets a companion who is armed with a deadly weapon, is not less guilty of such robbery because he himself is unarmed. (*People* v. *Perkins,* 37 Cal.2d 62, 64 [230 P.2d 353].) It need not be shown that the direct perpetrator of a crime expressly communicated his purpose to the accused in order to make the latter liable as an aider and abettor (*People* v. *Carlson, supra,* at p. 205) ; and one may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it. (*People* v. *Villa,* 156 Cal.App.2d 128, 134 [318 P.2d 828].)

 In addition to the evidence heretofore set forth regarding appellants' participation in the crimes charged, there was also testimony regarding conflicting statements made by them following their arrests.

There was testimony that appellant Snyder initially told the police officers that she entered the grocery store with Burke, that they left together and that afterward they went to drink at a bar, the name of which she did not recall. In the recorded conversation between appellants and Burke, hereinafter more fully discussed, appellant Snyder stated that she ''had told the cops that she had gone to Max's Grocery Store to buy a bottle of Vodka.'' Further, in the same conversation, Snyder asked what explanation the others were going to make to their going ''to that liquor store, so far away, and not hold it up,''— thereby indicating her prior knowledge of the earlier robbery involving Stadnick. In addition, a recording of a conversation between Burke and the police officers was played before the jury by way of impeachment. Since the contents of that recording have not been made a part of the record, we may assume that this additional evidence may have served further to discredit Mrs. Snyder's version of the relevant events. The record demonstrates that the evidence of guilt is abundantly sufficient as to both appellants.

 Appellants next assert that they ''were deprived of due process of law in that their convictions were secured by police eavesdropping effected by fraud.'' This assertion arises from the fact that following their arrests, after having been

separately interrogated for a time, either the codefendant Burke or appellant Stadnick requested that "the three of them be allowed to talk it over, and then they would see what they wanted to state, what kind of statement they wanted to make." The investigating officer then directed them to a room which he stated was "soundproof" and told them they could "have ten minutes." The room was electronically equipped in such fashion that the officer could overhear their conversation in an adjoining room and simultaneously the conversation was being recorded elsewhere in the building. During the trial, the officer was permitted to testify regarding this conversation.

Actually this evidence lent little additional weight to the People's case because in substance it tended only to prove the fact that Burke had expressed his intention to plead guilty and to say that the others did not know what was going on. Appellants' statements during the conversation were merely to the effect that they had told "their stories" and were going to "stick by them." The "stories" as related by the officer were essentially the same as those to which they testified; the conversation admittedly contained no indication that they were going to "make up" anything.

Appellants do not suggest that this conversation invoked any such privileged or confidential communications as are protected by law (Code Civ. Proc., § 1881) or that any admissions or confessions therein made were secured through the use of any threat, menace or duress, or as the result of any promise of reward or immunity. It is simply urged that the conduct of the police in this case in violating appellants' promised privacy was "morally reprehensible, [and] was, in effect, simply a new and moderately ingenious device to secure involuntary admissions." The only citation presented by appellants for this contention is *Lanza* v. *New York,* 370 U.S. 139 [139 S.Ct. 1218, 8 L.Ed.2d 384].

The facts in the cited case are substantially different from those here presented. There the authorities had placed secret recording devices in the *visitors'* room of a jail, and yet Mr. Justice Stewart, in delivering the opinion of the court, stated, "But to say that a public jail is the equivalent of a man's 'house' or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, *is at best a novel argument. . . .* Yet without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile,

an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day. . . .'' (Emphasis added.) Further, our Supreme Court denied a hearing and the United States Supreme Court denied *certiorari* (8 L.Ed.2d 830) in the case of *People* v. *Morgan*, 197 Cal.App.2d 90 [16 Cal.Rptr. 838], which involved a similar electronic eavesdropping in the visitors' room of a jail by means of an intra-building telephone.

It was early established in this state that ''The fact that a confession was procured by the employment of falsehood by a police officer, detective, or other person does not alone exclude it; nor does the employment of any artifice, deception or fraud exclude it, if the artifice or fraud employed was not calculated to procure an untrue statement. Neither does the fact that a confession was obtained by a promise of secrecy render it incompetent, if there was no motive to produce a false statement.'' (*People* v. *Castello*, 194 Cal. 595, 602 [229 P. 855].) Also, in *People* v. *Santo*, 43 Cal.2d 319 [273 P.2d 249], at page 325, a policeman who had posed as one seeking to help a defendant in jail awaiting trial account for her whereabouts on the night of the crime, was permitted to testify regarding statements made by the defendant which tended to show her consciousness of guilt and which amounted to admissions against interest.

It is appellant's final assignment of error that they were prejudiced by the court's refusal to order separate trials. While it is true that when the codefendant Burke pleaded guilty following the selection of the jury, the primary connecting link between the two appellants and the two crimes was removed from the cause, appellants did not see fit to request a severance at that time. Rather, they chose to wait until the second day of trial after the People had put on almost their entire case in chief, consisting of the testimony of the two victims and the arresting officer, before they determined to make their motion. A separate trial is not a matter of right in every instance. (*People* v. *Lushenko*, 170 Cal.App.2d 772, 779 [339 P.2d 956].) Even such right as an accused may have to a separate trial may be waived either by express agreement or by failure to object to a joint trial. (*People* v. *Marvich*, 44 Cal.App.2d 858, 860 [113 P.2d 223].)

Appellants cite *People* v. *Alviso*, 55 Cal. 230 for the proposition that it is discretionary with the trial court whether it will grant separate trials following a waiver and argue that

where discretion exists the possibility of abuse thereof also must exist. This is doubtless true, but certainly no showing of abuse of discretion appears from the instant record.

The judgments and orders denying new trials are affirmed as to both appellants.

Fox, P. J., and Ashburn, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 21, 1962.