[Crim. No. 3559.   Third Dist.   Dec. 3, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. GEORGE CHAMBERS, Defendant and Appellant.

Morris M. Grupp for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Doris H. Maier, Assistant Attorney General, Daniel Kremer and Raymond M. Momboisse, Deputy Attorneys General, for Plaintiff and Respondent.

FRIEDMAN, J.—Defendant George Chambers and one Sarah Spitler were jointly indicted on charges of assaulting Hugh Lawrence by means of force likely to produce great bodily injury on May 2, 1963, in violation of Penal Code section 245. Sarah Spitler was separately indicted for three

separate assaults upon Hugh Lawrence occurring on April 18, May 16 and May 27, 1963. Both defendant were represented by the same attorney. By stipulation of the prosecutor and defense counsel, the two actions were consolidated for trial. The jury found Sarah Spitler guilty of the four assaults charged against her and Chambers of the one charged against him. Following a judgment imposing a state prison sentence, Chambers appealed. Mrs. Spitler has not appealed.

At the time of the alleged offenses, Chambers was the owner of a state-licensed rest home for aged and mentally ill patients. He had purchased the establishment in 1962 from Mrs. Spitler, who had previously operated it for some years. Mrs. Spitler had extensive experience in the care of mental patients, and when Chambers purchased the home he employed her to stay on at the establishment as supervising nurse. The institution accommodated about 12 patients.

Hugh Lawrence, the victim, was a patient in the rest home. The testimony directly addressed to the single offense charged against Chambers occupies only three pages of the reporter's transcript; all this testimony was given by Hope Delgado, a nursing assistant. The substance of Mrs. Delgado's testimony was as follows: On the morning of May 2, 1963, she and Mrs. Spitler were feeding Hugh Lawrence, who was 75 years old and in an emaciated condition, weighing 110 pounds. Lawrence refused to take food and Mrs. Spitler slapped him. Later that morning the two women were bathing Lawrence. The patient was lying in bed with restraints on his ankles and hands. He was a quiet patient. He raised his knees and held them together. Mrs. Spitler asked him to straighten out, but he refused. She then called to Chambers, who was outside the room, saying: "Come on, George, come and help me with this son-of-a-bitch'n bastard." Chambers came in immediately and hit Lawrence four hard blows in the stomach with his closed fist. Chambers then left, saying to the patient: "Better mind this woman because she knows her business." At the time the blows were struck, Mrs. Spitler was on one side of the bed, the witness on the other. The witness offered no explanation why she or Mrs. Spitler did not simply pull his knees apart and bathe him, rather than call upon Chambers for assistance. The assault produced no bruises or marks on Lawrence. According to this testimony, the slap administered by Mrs. Spitler and the punches delivered by Chambers on May 2, 1963, were separate incidents, not a jointly committed assault.

Without eliciting objection, Mrs. Delgado further testified that on two other occasions she saw Chambers strike Hugh Lawrence in the stomach with his fist; that during the first week of April 1963, while Chambers was sleeping on a sun porch, he was awakened by a patient named Snyder; that Chambers was much annoyed and struck Snyder six times in the face, giving him a bloody nose.

Both defendants took the witness stand. Both denied Mrs. Delgado's testimony of the May 2, 1963, incident and testified that it could not have happened because both were absent from the home on a shopping expedition to buy supplies and to pick up a patient in Sacramento. They introduced receipts from a grocery store, a gas station and an auto parts establishment to verify their testimony. Chambers denied the other incidents described by Mrs. Delgado. Mrs. Spitler testified that while Snyder was in fact assaulted, the person who had been awakened and had struck Snyder was another patient, one Charles Worth.

The rest of the evidence introduced during the three-day trial was directed against Mrs. Spitler alone. There was no evidence of joint or conspiratorial action. The prosecution produced against Mrs. Spitler testimony involving numerous other alleged assaults against patients. These other offenses included the slapping of a patient; striking a patient in the abdomen with a closed fist; beating one woman who ran away; slapping another patient three times; pouring mush on a woman patient, knocking her down, dragging her to the bathroom, putting her in a tub, pouring water on her face, forcing her to drink the water until she was bloated, then leaving her on the bathroom floor and walking out; cutting a patient's mouth by use of a spoon while the patient was being fed, then compelling the patient to swallow the blood along with food forced into her mouth; bashing a patient's head against the wall of the bathroom so hard that a dent was made in the wall and a bump raised on the patient's head; kicking a patient, causing her to fall. There was also testimony that Mrs. Spitler on one occasion had pushed an elderly woman into her room with such force that she fell against a bed and then to the floor; that she punched a 70-year-old woman in the stomach as she sat on the toilet; that she hit a woman in the mouth with a closed fist so hard that blood poured from her mouth. There was no testimony and no claim that Chambers had been connected with any of these instances of abuse committed by Mrs. Spitler. Testimony relative to such prior

incidents involving Mrs. Spitler represented more than half of the total testimony offered at the trial, and the incidents covered six or seven years. This evidence was offered with little or no objection from defense counsel.

On appeal defendant contends that the evidence was insufficient to sustain the conviction and that admission of evidence regarding prior offenses was erroneous and prejudicial. There are other defense contentions which, for reasons which will be apparent, require no comment.

Mrs. Delgado's testimony supplied adequate evidence to support the verdict. Mrs. Delgado not only testified that Chambers hit the patient "hard" with his closed fist, but in the presence of the jury she demonstrated the manner and to some extent the force of the blows struck. There was also in evidence a photograph of the patient, showing his approximate condition at the time of the assault and displaying an aged, emaciated and probably weak person who might easily suffer great bodily injury from the force of the blows. (*People v. McCaffrey*, 118 Cal.App.2d 611, 616 [258 P.2d 557].)
▋ Although there was no evidence that the blows produced visible results, the gravamen of the offense is the likelihood that great bodily injury will result from the force applied, not that injury actually occurred. (*People* v. *Pullins*, 95 Cal. App.2d 902, 904 [214 P.2d 436]; *People* v. *Schmidt*, 66 Cal. App.2d 253, 256 [152 P.2d 1021].)

In reviewing this conviction, we find ourselves in an unusual situation, characterized by a paucity of error technically available for appellate review, but emphatically demanding defendant's retrial under better circumstances. Our examination of the record convinces us that defendant was tried and convicted under conditions which deprived him of a fair trial and denied him due process of law.

The adjudicatory process was profoundly influenced by an unusual combination of commonplace elements, in part quite permissible, in part erroneous but not assignable as error in the absence of objection in the trial court. These elements consisted of: (1) the stipulated consolidation of defendant's trial with the trial of separate and unrelated offenses charged against Mrs. Spitler; (2) admission without objection or admonition of voluminous evidence of unrelated acts of brutality by Mrs. Spitler, admissible only because she was on trial for offenses unrelated to that charged against Chambers; (3) the disgusting, inflammatory character of this evidence, which fastened Chambers with moral responsibility (but not

criminal responsibility) for the operation of an establishment in which elderly, helpless patients were cruelly treated; (4) admission without objection of inadmissible testimony of unconnected assaults by Chambers; (5) the comparative thinness of directly incriminating evidence in relation to the massive quantum of prejudice-arousing evidence of brutality in the rest home owned by Chambers; (8) the technical correctness and practical inadequacy of an instruction directing the jury to disregard evidence adduced against one defendant alone; (7) and finally, accentuation of the impression of moral partnership by an astounding line of prosecution questions suggesting to the jurors that Chambers and Mrs. Spitler probably shared a single bed.

The events were triggered by an order consolidating the trial of all charges. There is no evidence that the prosecution planned a devious strategic trap, but the results were no less drastic. Unaware of the prosecution's far-reaching evidentiary plans, defense counsel consented to consolidation and did not move for separate trials. The consolidated trial was heavily weighted with evidence of Mrs. Spitler's brutality, offered and received without objection under misconceptions of law apparently shared by the trial court, the prosecutor and defense counsel. On appeal, defendant is now severely limited by waivers and failures to object. According to the decisions, his failure to demand a separate trial waives any right to object to consolidation. (*People* v. *Stadnick,* 207 Cal.App.2d 767, 774 [25 Cal.Rptr. 30]; *People* v. *Smith,* 185 Cal.App.2d 638, 644 [8 Cal.Rptr. 581].) Under established rules, his failure to object to evidence of other offenses precludes attack on appeal. (*People* v. *Mims,* 160 Cal.App.2d 589, 598 [325 P.2d 234].) Consequently, we cannot now say that these features of defendant's trial constituted prejudicial error, meriting reversal under article VI, section 4½, of the state Constitution. ■ We have concluded, however, that defendant was probably convicted by association with Mrs. Spitler, in trial and otherwise, rather than by evidence of his personal guilt, that an unfairness so gross has occurred as to deprive him of due process of law. When a defendant has been convicted through a denial of due process, the saving provisions of article VI, section 4½, of the state Constitution cannot remedy the vice and the conviction cannot stand. (*People* v. *Sarazzawski,* 27 Cal.2d 7, 11 [161 P.2d 934].)

Guilt by association is a thoroughly discredited doctrine; personal guilt, on the other hand, is a fundamental principle of

American jurisprudence, inhabiting a central place in the concept of due process. (*Uphaus* v. *Wyman,* 360 U.S. 72, 79 [79 S.Ct. 1040, 3 L.Ed.2d 1090] ; *Bridges* v. *Wixon,* 326 U.S. 135, 163 [65 S.Ct. 1443, 89 L.Ed. 2103], concurring opinion.) The record impresses us with the belief that Chambers was probably fastened with vicarious responsibility for the long-continued brutality of Mrs. Spitler, in the absence of any charge of concerted or conspiratorial action. Hope Delgado's eyewitness account was the sole testimony incriminating Chambers. We cannot reexamine her testimony for the purpose of invading the jury's province but we do evaluate it, quantitatively and qualitatively, to determine whether the procedural and evidentiary aspects of the trial provided defendant with the essential attributes of due process. (See *People* v. *Parham,* 60 Cal.2d 378, 384-385 [33 Cal.Rptr. 497, 384 P.2d 1001].) Cross-examination revealed unrepaired inconsistencies in her direct testimony. Lucid and articulate on direct examination, Mrs. Delgado lapsed into frequent silences on cross-examination, claiming lack of comprehension and lapses of memory. Although Hugh Lawrence was visited regularly by a doctor who practiced in the area and by his son who lived 30 miles away, Mrs. Delgado said nothing regarding the mistreatment. She demonstrated resentment that Mrs. Spitler had called her a foreigner. Her testimony, such as it was, was countered by the denials of both defendants, who were somewhat supported by receipts for purchases made in Sacramento on May 2. Considered in isolation, the thin evidence of Chambers' guilt may well have failed to convince the jury.

The record, however, was inflated by extensive evidence of brutality of Mrs. Spitler, tending to fasten Chambers, as her employer, with moral responsibility for the acts of his employee. Cross-examining Mrs. Spitler, the prosecutor asked whether she and Chambers were living as man and wife, a matter completely outside the scope of the direct examination and utterly irrelevant to the trial issues. Having elicited her denial, he then asked whether they had represented themselves as man and wife, inquiries which met with affirmative responses. Further examination brought out the fact that at the time of her arrest, Mrs. Spitler was in Chambers' bedroom, he being in bed. This examination had no purpose in the trial, except the illegitimate purpose of suggesting to the jury that Mrs. Spitler was Chambers' inamorata, thus intensifying the notion of joint moral responsibility.

Apparently the trial judge, the prosecutor and defense counsel shared a belief in the admissibility of evidence of separate incidents in which either Mrs. Spitler or Chambers inflicted blows on patients. The district attorney offered extensive evidence of blows and similar acts to establish, as he described it, Mrs. Spitler's ''characteristic behavior pattern of assaults towards patients.'' Defense counsel objected only in occasional instances, when the acts were ''not of sufficient similarity'' to those specified in the indictments. The trial judge instructed the jury that: ''The value, if any, of such evidence depends on whether or not it tends to show that the defendant was guilty of the crimes charged by showing a peculiar or characteristic behavior pattern of the defendant. . . .''

■ Evidence of independent offenses is not admissible where its only effect is to demonstrate defendant's bad character or criminal tendencies. (*People* v. *Albertson*, 23 Cal.2d 550, 576-578 [145 P.2d 7]; *People* v. *Hadley*, 84 Cal.App.2d 687, 692 [191 P.2d 517]; 1 Wigmore on Evidence (3d ed.) §§ 193-194; Witkin, Cal. Evidence, § 135.) ■ If, however, evidence of other misconduct tends naturally and by reasonable inference to establish any fact material to the prosecution or to overcome a defense, it is admissible. (*People* v. *Downer*, 57 Cal.2d 800, 815-816 [23 Cal.Rptr. 347, 372 P.2d 107].) Such evidence is admissible to show intent (where intent is disputed) or to disclose a common plan or scheme permeating the charged offense and that offered in evidence. (*People* v. *Lisenba*, 14 Cal.2d 403, 427 [94 P.2d 569]; *People* v. *Zankich*, 189 Cal.App.2d 54, 62 [11 Cal.Rptr. 115]; *People* v. *Toth*, 182 Cal.App.2d 819, 826 [6 Cal.Rptr. 372]; Witkin, Cal. Evidence, §§ 137, 138.)

■ In the prosecution of Chambers intent was not in issue; nor were these separate and unconnected acts of violence asserted as separate manifestations of a common plan or scheme. Hope Delgado's description of other assaults by Chambers was tendered as part of the prosecution's case in chief, prior to the disclosure of the defendant's position. (Cf. *People* v. *Pike*, 58 Cal.2d 70, 91-92 [22 Cal.Rptr. 664, 372 P.2d 656].) Chambers' defense, as disclosed by his testimony, was an alibi, an outright denial of presence or participation. Neither at the time the evidence was offered nor thereafter during the trial was there any claim that on May 2 Chambers had physically contacted Hugh Lawrence without criminal intent. The described objective of the evidence (to show

"characteristic behavior pattern") was a euphemism which scarcely concealed its real purpose, to demonstrate the defendant's predisposition to commit assaults on helpless patients, in short, his criminal proclivities. Offered with that objective, the evidence was inadmissible. Nevertheless, it was offered and received without objection.

The Attorney General has cited a number of cases which do indeed permit evidence of other offenses on the strength of the phrase "peculiar or characteristic behavior pattern." (See, for example, *People* v. *Cavanaugh,* 44 Cal.2d 252, 265-266 [282 P.2d 53]; *People* v. *Crisafi,* 187 Cal.App.2d 700, 707 [10 Cal.Rptr. 155].) Analytically examined, the phrase is confined to the notion of *modus operandi,* a characteristic method or plan pursued by a defendant in the performance of repeated criminal acts. It does not open the door to indiscriminate proof of the defendant's sadistic character.

Mrs. Spitler had denied her presence in the assault of May 2. She also denied having committed the assaults charged against her alone. As to the latter charges, she did not deny her physical presence. Rather, her testimony inferred that she had been engaged in normal and reasonable handling of patients. The application of superior strength in the care of mental patients may pass by gradations from proper restraint to an extreme of brutality. (*Coomes* v. *State Personnel Board,* 215 Cal.App.2d 770, 776 [30 Cal.Rptr. 639].) An assertion that the nurse or attendant exercised no more than that degree of discipline necessary to accomplish the assigned task places in issue the question of intent, knowledge or design. Thus evidence of other acts of violence by Mrs. Spitler was properly in the record to negate innocent intent. (See *People* v. *Wells,* 33 Cal.2d 330, 341-343 [202 P.2d 53].) Evidence of Mrs. Spitler's acts could not, however, be considered in weighing Chambers' guilt, there being no claim of concerted or conspiratorial action.

Had Chambers been tried alone, evidence of Mrs. Spitler's "characteristic" treatment of patients would have been patently impermissible. It plays a role in Chambers' trial only because both defendants were tried together. Penal Code section 954 authorizes the consolidated trial of multiple charges, first, where a single accusatory pleading charges multiple offenses and second, where several accusatory pleadings charge separate offenses which are connected or of the same class. Section 954 does not directly deal with the joint trial of multiple defendants. That subject is covered by section

1098, which directs the joint trial of jointly charged defendants in the absence of an order for separation. Such an order is discretionary with the trial court.

These Penal Code provisions do not expressly authorize consolidation of separate charges against different defendants involving distinct and unconnected offenses. Several decisions hold that consolidation under such circumstances is error. (*People* v. *Biehler*, 198 Cal.App.2d 290 [17 Cal.Rptr. 862]; *People* v. *Davis*, 42 Cal.App.2d 70, 74-75 [108 P.2d 85]; see also *People* v. *Duane*, 21 Cal.2d 71, 76 [130 P.2d 123].) Although Mrs. Spitler was subject to a single trial on these multiple offenses of the same class (§ 954), and Chambers was subject to a joint trial with her on the joint indictment (§ 1098), nevertheless the offense charged against Chambers was utterly disconnected from the assaults charged against Mrs. Spitler. By the standard of the *Biehler-Davis* line of cases, the consolidation which occurred here would have been highly objectionable.

Without regard to the specific terms of sections 954 and 1098, another line of cases authorizes consolidation of separate charges against multiple defendants where the charges have "a common element of substantial importance in their commission." (*People* v. *Spates*, 53 Cal.2d 33, 36 [346 P.2d 5]; *People* v. *Chapman*, 52 Cal.2d 95, 97 [338 P.2d 428]; *People* v. *Williams*, 189 Cal.App.2d 29, 36-37 [11 Cal.Rptr. 43].) The common element, according to substantial authority, is an underlying set of common facts and common evidence. (*McElroy* v. *United States*, 164 U.S. 76, 80 [17 S.Ct. 31, 41 L.Ed. 355]; *People* v. *Duane, supra,* 21 Cal.2d at p. 76; *People* v. *Biehler, supra,* 198 Cal.App.2d at pp. 294-295.) In *People* v. *Spates*, however, the Supreme Court rejected the plaint of an appellant who urged that he should not have been jointly tried with another defendant who was separately charged with seven felonies other than the robbery and attempted robbery charged against both. The court stated (53 Cal.2d at p. 36): "The fact that defendant Spates was charged with only two of the crimes does not render the joinder improper, since there was a joint charge as to two of the crimes and a common element of substantial importance in the commission of all of them."

What "common element of substantial importance" all nine offenses possessed was not specified in the *Spates* opinion. There was no indication of common evidentiary elements underlying all nine offenses. To all appearances the sweep-

ing concept of joinder authorized by the *Spates* case embraces the present situation. We shall assume for present purposes that the joint charge of one felony against Chambers and Mrs. Spitler and the three separate felonies charged against Mrs. Spitler alone met the consolidation criterion of *People* v. *Spates.*

■ Relaxed standards of criminal trial consolidation invite procedural and evidentiary possibilities invasive of defendants' rights. (See *Marcante* v. *United States,* 49 F.2d 156; 68 Harv.L.Rev. 1046; 36 Colum.L.Rev. 1359.) The possibility becomes fairly acute when damaging evidence is received which is admissible against one defendant but not against others. Reported California decisions do not regard this circumstance as an ineluctable demand for separate trials. The prevailing California theory is that the jury may be effectively admonished to confine the evidence to the defendant against whom it is offered and to exclude it in weighing guilt of the defendant against whom it is inadmissible. (*People* v. *Santo,* 43 Cal.2d 319, 332 [273 P.2d 249]; cert. den. 348 U.S. 959 [75 S.Ct. 451, 99 L.Ed. 749]; *People* v. *Isby,* 30 Cal.2d 879, 896-897 [186 P.2d 405]; *People* v. *Walker,* 160 Cal.App. 2d 736, 740-741 [325 P.2d 594].) There is an announced presumption that jurors have been true to their oaths and have followed the admonitions of the court. (*People* v. *Isby, supra,* 30 Cal.2d at pp. 896-897.) Ultimate appellate control over consolidations is maintained by the qualification that such a jury instruction protects the defendant *in the absence of a strong showing to the contrary.* (*People* v. *Pike, supra,* 58 Cal.2d at p. 85; *People* v. *Santo, supra,* 43 Cal.2d at p. 332.)

Thoughtful judicial opinions have voiced misgivings as to jurors' ability to segregate evidence into separate intellectual boxes, each containing a single defendant. (*People* v. *Biehler, supra,* 198 Cal.App.2d at p. 298; see also *United States* v. *Haupt,* 136 F.2d 661, 673-674.) Unconscious motivations, psychologists tell, are pervasive. They slip into the processes of conscious mentation unseen, unfelt and usually unacknowledged. Exposed to the realities of depth psychology, judicial cliches carving jurors' minds into autonomous segments may waver and fail. At the minimum, the admission of damaging evidence applicable to less than all the defendants calls for firm judicial supervision and strong, carefully drawn instructions. A trial judge may find it advisable, sometimes essential, to comment on the evidence, carefully segregating that directed at one defendant or another.

Instructions in this case fell short of that need. As the trial progressed there were no admonitions to the jury confining evidence of Mrs. Spitler's blows and beatings to her case alone. Among the court's instructions to the jury was one directing that evidence received against one defendant was not to be considered against any other defendant. (CALJIC No. 39.) Although that instruction was immediately followed by two others dealing with evidence of other offenses (CALJIC No. 33, modified), the court did not specify which evidence was applicable to one defendant and which to the other. In the face of a record calling for a clear and firmly announced segregation of evidence, the single cautionary instruction was abstract and weak. It failed adequately to protect Chambers from the damaging effect of prejudice-arousing evidence applicable only to his codefendant. (Cf. *People* v. *Isby, supra,* 30 Cal.2d at p. 897.)

That we speak in terms of possibilities is no answer. We do not know of course what actually motivated the guilty verdict. Where fundamental demands for the individual adjudication of personal guilt may have been violated, we cannot take refuge in threadbare presumptions that the jury resolutely ignored inflammatory, irrelevant evidence and hewed strictly to the letter of its instructions. Instead we remand the matter to provide an opportunity for the defendant's retrial under more acceptable circumstances.

Judgment reversed.

Pierce, P. J., and Van Dyke, J.,* concurred.

A petition for a rehearing was denied December 24, 1964, and respondent's petition for a hearing by the Supreme Court was denied January 27, 1965. Mosk, J., did not participate therein.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.