SHERIFF, WASHOE COUNTY, APPELLANT, *v.*
KEVIN BESSEY, RESPONDENT.

No. 26362

April 3, 1996                                   914 P.2d 618

*Frankie Sue Del Papa,* Attorney General, Carson City; *Richard A. Gammick,* District Attorney, and *Gary H. Hatlestad,* Deputy District Attorney, Washoe County, for Appellant.

*Michael Specchio,* Public Defender, and *John Reese Petty,* Deputy Public Defender, Washoe County, for Respondent.

## OPINION

By the Court, SHEARING, J.:

The State charged respondent Kevin Bessey with two counts of

sexual assault, one count of attempted sexual assault, two counts of statutory sexual seduction, one count of attempted statutory sexual seduction, and one count of open or gross lewdness. After a preliminary hearing, the justice of the peace bound Bessey over for trial on a number of the charges. Bessey filed a petition for a writ of habeas corpus in the district court. The district court found that a detective had improperly fabricated evidence, concluded that Bessey's inculpatory statements should have been suppressed, and dismissed the information. The State filed a sheriff's appeal, arguing that use of the fabricated evidence in the interrogation did not render the inculpatory statements involuntary. We agree.

Preliminarily, we point out that Bessey employed the wrong procedure to challenge the admissibility of his inculpatory statements. "Pretrial habeas corpus may not be used to challenge admissibility of evidence on constitutional grounds. Cook v. State, 85 Nev. 692, 462 P.2d 523 (1969). Such a challenge should be made in a motion to suppress evidence, and review of the district court's ruling may be sought following trial and conviction." Hardin v. Griffin, 98 Nev. 302, 304, 646 P.2d 1216, 1217 (1982). The district court erred in granting pretrial habeas relief because habeas may not be used to challenge admissibility of evidence on constitutional grounds.

Even if Bessey had filed a proper motion to suppress, his inculpatory statements should not have been suppressed. Bessey contended that his inculpatory statements were made after the police officer showed Bessey a fabricated document implicating him as the perpetrator of a sexual assault on a minor. Bessey was asked to come to the police department for an interview after a fourteen-year-old girl gave a statement to the police alleging that Bessey had performed numerous sexual acts on her without her consent. At the interview, Bessey denied engaging in any sexual acts with the minor until the police officer asked him if he could explain why analysis of the couch at the apartment where these acts allegedly occurred showed his semen present. The actual analysis was negative, but the officer presented Bessey with a false crime lab report, which the officer had prepared. Bessey then made a number of inculpatory statements.

"To determine the voluntariness of a confession, the court must consider the effect of the totality of the circumstances on the will of the defendant. The question in each case is whether the defendant's will was overborne when he confessed." Passama v.

State, 103 Nev. 212, 214, 735 P.2d 321, 323 (1987). Police deception is a relevant factor in determining whether or not a confession is voluntary. *See* Frazier v. Cupp, 394 U.S. 731, 739 (1969). However, an officer's lie about the strength of the evidence against the defendant is, in itself, insufficient to make the confession involuntary. Holland v. McGinnis, 963 F.2d 1044, 1051 (7th Cir. 1992), *cert. denied,* 506 U.S. 1082, 113 S. Ct. 1053 (1993).

Cases throughout the country support the general rule that confessions obtained through the use of subterfuge are not vitiated so long as the methods used are not of a type reasonably likely to procure an untrue statement. C.T. Drechsler, Annotation, *Admissibility of Confession as Affected by Its Inducement through Artifice, Deception, Trickery, or Fraud,* 99 A.L.R.2d 772, 783 (1965 & Supp. 1993).

In *Frazier,* the police falsely told a defendant that his codefendant had already confessed. The court concluded that "[t]he fact that the police misrepresented the statements [the codefendant] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible." 394 U.S. at 739. The *Holland* court stated that "[o]f the numerous varieties of police trickery . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary." 963 F.2d at 1051. The court went on to say the following:

> Such misrepresentations, of course, may cause a suspect to confess, but causation alone does not constitute coercion; if it did, all confessions following interrogations would be involuntary because "it can almost always be said that the interrogation caused the confession." *Miller v. Fenton,* 796 F.2d 598, 605 (3d Cir.), *cert. denied,* 479 U.S. 989, 107 S. Ct. 585, 93 L. Ed. 2d 587 (1986). Thus, the issue is not causation, but the degree of improper coercion, and in this instance the degree was slight. Inflating evidence of Holland's guilt interfered little, if at all, with his "free and deliberate choice" of whether to confess, *Moran v. Burbine,* 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986), for it did not lead him to consider anything beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime. In other words, the deception did not interject the type of extrinsic considerations that would overcome Holland's will by distorting an otherwise rational choice of whether to confess or remain silent.

*Id.* at 73.

In State v. Kelekolio, 849 P.2d 58, 71-74 (Haw. 1993), the Hawaii Supreme Court considered the relevant case law and scholarly authority and formulated a rule by which to measure the legitimacy of the use of deception by the police in eliciting confessions or inculpatory statements from suspects and arrestees. The *Kelekolio* court adopted the following rule:

> [E]mployment by the police of deliberate falsehoods *intrinsic* to the facts of the alleged offense in question will be treated as one of the totality of circumstances surrounding the confession or statement to be considered in assessing its voluntariness; on the other hand, deliberate falsehoods *extrinsic* to the facts of the alleged offense, which are of a type reasonably likely to procure an untrue statement or to influence the accused to make a confession regardless of guilt, will be regarded as coercive *per se,* thus obviating the need for a "totality of circumstances" analysis of voluntariness.

849 P.2d at 73.

Examples of *intrinsic* falsehoods would include misrepresentations regarding the existence of incriminating evidence such as placement of the defendant's vehicle at the crime scene, physical evidence linked to the victim in the defendant's car, presence of defendant's fingerprints at the crime scene or in the getaway car, positive identification by reliable eyewitnesses, and identification of the defendant's semen in the victim or at the crime scene. *See id.* Examples of extrinsic falsehoods of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt would include the following: assurances of divine salvation upon confession, promises of mental health treatment in exchange for confession, assurances of more favorable treatment rather than incarceration in exchange for confession, misrepresenting the consequences of a particular conviction, representation that welfare benefits would be withdrawn or children taken away unless there is a confession or suggestion of harm or benefit to someone. *See* Lynumn v. Illinois, 372 U.S. 528 (1963); *Kelekolio,* 849 P.2d at 73-74.

In this case, the detective's lie and the falsified lab report went to the strength of the evidence against Bessey, a consideration intrinsic to the facts of the alleged offense. Therefore, the court must consider the totality of the circumstances which produced Bessey's statements to determine whether they were voluntary. We conclude that there was nothing in the treatment of Bessey or the setting of the interrogation that was coercive. Bessey went to the police station voluntarily and the length of the interview was

relatively short. The only factor that was out of the ordinary was the production of the falsified lab report. Based on the law in this area and the facts of this case, there is no reason to believe that Bessey's inculpatory statements were not voluntary. The false report would not have implicated any concerns on Bessey's part other than consideration of his own guilt or innocence and the evidence against him. There is nothing about the fabricated document presented to Bessey in this case which would have produced a false confession.

The one case Bessey relies upon in support of the suppression of his admissions is State v. Cayward, 552 So. 2d 971 (Fla. Dist. Ct. App. 1989), *review denied,* 562 So. 2d 347 (Fla. 1990). In *Cayward,* the police fabricated two scientific reports that indicated that the semen stains on the victim's underwear came from Cayward. The police showed the false reports to Cayward because they suspected him of sexually assaulting and smothering his five-year-old niece. Some time later in the interview, Cayward confessed. The Florida court held that the manufacture of false documents by police officials offends the traditional notions of due process under both the state and federal constitutions. *Id.* at 974. We disagree with the Florida court's standard and rationale.

The *Cayward* court placed great emphasis on the fact that the false statement to the suspect was written rather than verbal and decided to draw a bright-line rule on that basis. Under the *Cayward* decision, the police could have verbally lied to the defendant by telling him that his semen had been found; but, the fact that the lie was embodied in a piece of paper made it a violation of due process. This is a distinction without a real difference. Moreover, it ignores the basic test for the voluntariness of confessions which the United States Supreme Court has set out. Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973); *Passama,* 103 Nev. at 214, 735 P.2d at 323. Under prevailing law, the appropriate question is whether the deception, whatever its nature, would have induced a false confession under the circumstances. *Holland,* 963 F.2d at 1051. If it would not, then the defendant's rights were not violated, and suppression of the defendant's subsequent statements is unwarranted. *Id.*

It has been argued that fabricated documents used in interrogation may find their way into court as evidence. The case of United States v. Khoury, 901 F.2d 948 (11th Cir. 1990), *modified on other grounds,* 910 F.2d 713 (11th Cir. 1990), is used as an example. *Khoury* actually demonstrates that the system works to differentiate authentic from fabricated documents. False documents may "go astray," but our evidentiary rules are designed to prevent their use in our legal forums. Moreover, the *Khoury*

court recognized that "such falsifications, in certain circumstances, may be a necessary investigatory method. . . ." 901 F.2d at 970.

The *Cayward* court also raises the bogeyman that allowing police to use false documents in interrogation would open the door to fabrication of court documents, such as warrants or judgments, thus eroding the public's respect for the authority of court orders. 552 So. 2d at 974-75. We strongly disagree. One can postulate all types of scenarios which would not pass constitutional muster and would erode the public's confidence, but that does not mean that the rather innocuous document used in the interrogation in the instant case is such a document.

Some would argue that the police should not lie at all. However, that is not the current policy. Otherwise, many common police tactics would be barred. Several techniques which involve deception include undercover police officers, sting operations, and interrogation techniques such as offering false sympathy, blaming the victim, minimizing the seriousness of the charge, using a good-cop/bad-cop routine, or suggesting that there is sufficient evidence when there is not. As long as the techniques do not tend to produce inherently unreliable statements or revolt our sense of justice, they should not be declared violative of the United States or Nevada constitutions.

The position that permitting police to fabricate documents leads us down a slippery slope displays little confidence in our courts and is out-of-step with what we are trying to accomplish—namely, to achieve justice. It may be a comfort to judges to have a bright-line test dictating that verbal lying in interrogation is allowed, but fabrication of documents is forbidden. However, this ignores the basic question at issue—would the police action have induced a false confession? If the deception, whatever its nature, would not, the confession should be admissible. In the instant case, there is no evidence or credible argument that the fabricated document did produce or was likely to produce a false confession.

Accordingly, we reverse the judgment of the district court and remand this case to the district court for further proceedings.

STEFFEN, C. J., concurs. Springer, J., concurs in result only.

ROSE, J., with whom YOUNG, J., joins, dissenting:

I dissent because the majority is providing police and prosecutors with an investigatory weapon which they have little if any need for, but which has great potential for intentional abuse and inadvertent harm and havoc.

This case sets the limits to which law enforcement can go in using deception or falsehoods to secure a confession from a

defendant. Unfortunately, the majority sets no limits at all—permitting the police to use all manner of falsehoods and deception in attempting to secure a confession. Understanding that law enforcement needs some latitude in fighting crime, this court should permit police to use verbal deception but prohibit their use of falsehoods or deception in written or other tangible form, such as falsified lab tests, witness statements, or doctored photographs. This strikes an appropriate balance between the necessity for the police to use some deception in developing evidence, while prohibiting the carrying of such deception or falsehoods to a truly unfair advantage over an accused.

"The test for determining admissibility of a statement obtained by police deception is whether that deception produced a false or untrustworthy confession or statement." State v. Haywood, 439 N.W.2d 511, 514 (Neb. 1989). As the majority correctly states, this is the approach most courts have taken on this issue. *See* State v. Kelekolio, 849 P.2d 58, 71-74 (Haw. 1993); C.T. Drechsler, Annotation, *Admissibility of Confession as Affected by Its Inducement through Artifice, Deception, Trickery, or Fraud,* 99 A.L.R.2d 772 (1965 & Supp. 1993).

In this case, the detective's lie and the falsified lab report went to the strength of the evidence against Bessey and may not have implicated any concerns on Bessey's part other than consideration of his own guilt or innocence and the evidence against him. On the other hand, none of the cases cited above or cited by the majority to support its opinion dealt with the fabrication of documents or physical evidence by police. Thus, those cases did not consider the reliability of a confession induced by confrontation with ostensibly irrefutable hard scientific evidence, as opposed to mere oral allegations. Nor did they consider the propriety or practical consequences of police fabrication of documents or other evidence. Although these considerations are implicated in the instant case, the majority fails to acknowledge them and therefore fails to recognize that the Florida court's distinction between oral lies and fabricated physical or documentary evidence is based on a very real and significant difference.

The Florida court held that the manufacture of documents by police to obtain a confession overstepped the line of permitted deception and violated due process under the federal and state constitutions. State v. Cayward, 552 So. 2d 971, 974 (Fla. Dist. Ct. App. 1989), *review dismissed,* 562 So. 2d 347 (Fla. 1990). The defendant in that case was suspected of sexually assaulting and smothering his five-year-old niece, but the police had insufficient evidence to charge him.

> With the knowledge of the state attorney's office, the police fabricated two scientific reports which they intended to use

as ploys in interrogating the defendant. One false report was prepared on stationery of the Florida Department of Criminal Law Enforcement; another was prepared on stationery of Life Codes, Inc., a testing organization. These false reports indicated that a scientific test established that the semen stains on the victim's underwear came from the defendant. The police showed the reports to the defendant as a device to induce a confession. Some time later during the interview, the defendant confessed.

*Id.* at 972.

The Florida court cited "the basic principle that when conduct of law enforcement is outrageous, due process bars the government from invoking judicial process to obtain a conviction," but it also recognized that "police deception does not render a confession involuntary per se." *Id.* at 973.

The instant case, however, presents a different question and one which appears to be one of first impression not only in Florida but in the United States. The reporters are filled with examples of the police making false *verbal* assertions to a suspect, but counsel has not indicated nor has our research revealed any case in which the police actually manufactured false documents and used them precisely as the police did in this case.

*Id.* Reasonable expectations regarding the adversarial nature of police interrogation "do not encompass the notion that the police will knowingly fabricate tangible documentation or physical evidence against an individual. . . . Thus we think the manufacturing of false documents by police officials offends our traditional notions of due process of law under both the federal and state constitutions." *Id.* at 974.

In addition, the court in *Cayward* based its decision on "practical concerns." *Id.* "Unlike oral misrepresentations, manufactured documents have the potential of indefinite life and the facial appearance of authenticity. A report falsified for interrogation purposes might well be retained and filed in police paperwork. Such reports have the potential of finding their way into the courtroom." *Id.* The court noted the immense workload of the police and prosecutors and the long periods of time that investigations and prosecution may take. Officials who prepare false reports may leave, die, or forget the origins of the reports. The prevalence of photocopying exacerbates the possibility for confusion. Also, false documents might be disclosed to the media as a public record. *Id.*

The *Cayward* court went on to note that courts routinely accept documents which appear to be self-authenticating. One of the

reports in *Cayward* was such a document. Furthermore, to approve the false reports at issue might open the door to fabrication of court documents, such as warrants or judgments, which could erode the public's respect for the authority of court orders. *Id.* at 975.

The majority has not addressed or even acknowledged these concerns raised by the Florida court. A complicated federal drug case shows that these practical concerns are not merely farfetched hypotheticals. In United States v. Khoury, 901 F.2d 948, 969-71 (11th Cir. 1990), *modified on other grounds,* 910 F.2d 713 (11th Cir. 1990), the defendants moved for a new trial because government prosecutors had withheld an exculpatory investigatory report from them in violation of Brady v. Maryland, 373 U.S. 83 (1963). At an ex parte in camera hearing, the government informed the district court that the report

> was completely fictitious, signed by non-existent DEA special agents, chronicling a conversation that never occurred with a confidential informant who was invented by the DEA. The purpose of this elaborate ruse was to create seemingly exculpatory material, plant it in the law enforcement computer network, and thus track down unauthorized access to the computer by someone associated with a defendant in the case.

*Khoury,* 901 F.2d at 970. The district court denied the defendants' motion for a new trial. The circuit court reversed this denial because it was based on unsworn and mostly hearsay statements. The circuit court remanded for an evidentiary hearing to determine whether the report constituted *Brady* material. *Id.* at 971. The *Khoury* court cited *Cayward* and stated its own concern about "the potential that false documents have to wreak havoc should they go astray." *Id.* at 970. "Nonetheless, we recognize that such falsifications, in certain circumstances, may be a necessary investigative method . . . ." *Id.* Unlike here, the false document in *Khoury* was not employed to obtain a confession.

Another problem with the majority opinion is that it tacitly assumes that police and prosecutors need to fabricate evidence to be effective in cases like this, but the State has shown no necessity for the use of fabricated physical or documentary evidence in attempting to obtain confessions from suspects. The rationale in *Cayward* applies to "fabricat[ing] tangible documentation or physical evidence against an individual." *Cayward,* 552 So. at 974. Due process would not be violated by oral misrepresentations by police regarding the contents or nature of a document or audio tape or other tangible item. Police officers could still employ such items as props, claiming that they were evidence

against a suspect, without fabricating evidence and creating the potential for intentional or unintentional misuse. The record in this case indicates that any document looking like a lab report would have worked just as well with Bessey: it appears that the police and the lab had no sample of DNA from Bessey to compare any recovered semen with, but Bessey did not understand the implications of this. On the other hand, a more knowledgeable suspect, even if guilty, would realize that such a lab report must be phony, whether police actually fabricated it or just claimed to have it. The potential for havoc and injustice resulting from allowing police to fabricate evidence to obtain confessions appears to be much greater than its potential benefits in obtaining otherwise unobtainable, valid confessions.

The concerns voiced in *Cayward* and *Khoury* apply in this case. *Cayward* is well reasoned and persuasive authority, especially in regard to the practical problems and potential abuse that fabrication of documents can lead to. This court would be well advised to adopt its reasoning and hold that the use of fabricated documents to induce confessions violates due process under both the federal and the state constitutions. U.S. Const. amends. V and XIV, § 1; Nev. Const. art. 1, § 8.