[Crim. No. 3385. Second Appellate District, Division One.—November 8, 1940.]

THE PEOPLE, Respondent, v. ROY B. OGDEN, Appellant.

Morris Lavine for Appellant.

Earl Warren, Attorney-General, and R. S. McLaughlin, Deputy Attorney-General, for Respondent.

WHITE, J.—In an information filed by the district attorney of Los Angeles County defendant was accused in count I of the crime of kidnaping; count II charged the crime

of rape; count III a violation of section 286 of the Penal Code, and count IV alleged a violation of section 288a of the same code. Following denial of a motion to set aside the information, and the entry of not guilty pleas to all counts, defendant was tried by a jury which returned verdicts finding him guilty of kidnaping and forcible rape and not guilty of violating sections 286 or 288a of the Penal Code. A motion for a new trial was denied and judgment accordingly pronounced. From the order denying him a new trial and from the judgment of conviction defendant prosecutes this appeal.

Stating the evidence adduced at the trial in the light most favorable to the prosecution, as we are required to do following a guilty verdict, the record discloses that the prosecutrix, a woman 28 years of age, totally deaf, and who had been married, was earning her living selling flowers to the patrons of various clubs and cafes along and in the vicinity of Vermont avenue in the city of Los Angeles. About 8 o'clock on the night of December 12, 1939, in the Friars Club, she encountered defendant, whom she had not theretofore known, and to whom on that occasion she sold a flower. About 11:30 p. m. of the same night she again saw defendant at the 741 Club located across the street from the Friars Club. Defendant followed her out of the last-named club, and by motions indicated an offer to take her elsewhere to sell flowers, which invitation she rejected and re-entered the Friars Club, where she continued the sale of flowers. About 12:30 a. m. the prosecutrix left the Friars Club and went to other resorts in the neighborhood to sell flowers. Shortly before 2 a. m. she returned to the Friars Club to put her unsold flowers on ice preparatory to going home. Here she again encountered the defendant, who was coming out of the club as she was about to enter. Defendant renewed his invitation to take her elsewhere to sell flowers, which offer she again rejected, whereupon defendant took hold of her arm and motioned to a man called "Leo" to get his automobile, which the latter did, driving it up in front of the club. According to the testimony of the prosecutrix, defendant pushed her into the automobile, and as "Leo" drove the car away she was seated in the single seat between the driver and the defendant. She remonstrated and told them she wanted to go back to the Friars Club, but they stopped at another club where she sold a couple of flowers; then the driver of the car indicated he

was going in the other direction and that the prosecutrix was to go with the defendant. According to her testimony, expecting to be taken back to the Friars Club, she entered appellant's car, but he drove to another club on Eighth and Western. With the defendant, she entered this club and was by him introduced to the owner, who gave her permission to come to his place and sell flowers. Just a few minutes before 2 o'clock they left this club, the prosecutrix telling appellant she wanted to go to the Friars Club before it closed at 2 a. m. The prosecutrix preceded defendant into the car. Noticing that defendant was watching her through the window of the automobile, she started to get out of the car, but appellant grabbed her and held her down while he put the car in motion and drove away. He had his arm around her neck and smothered her down against his clothes so that, according to her testimony, it was with difficulty she was able to breathe. Eventually she opened the door of the automobile with her foot, at about which time they came to a main thoroughfare, when she started to jump out of the car and defendant lost control of the automobile while trying to hold her in it. Defendant then stopped the car suddenly, and regarding what there occurred the prosecutrix testified as follows (quoting from the transcript of her testimony taken at the preliminary examination, and which transcript, by reason of the deafness of the prosecutrix, was by stipulation used at the trial):

" . . . and I fell out on the street on my back, hit my head hard and it made me dizzy, on the hard pavement. He leaned over, I started to scream then and he leaned over and took ahold of the back of my hair to hold on to me and I said, 'Oh, they can't hear me screaming,' and at the same time he pulled me back in. He was pulling with all his strength to get me back in and I was pulling in the other direction with all mine, went like that until my hair all came loose, and it threw him off his balance and he fell on the street on top of me. I fell back on the pavement again when my hair came loose, it left me dizzy, we started struggling in the street there. I fought for a few minutes and then my hand was broken fighting with him, I didn't have any more strength left, it was getting dark because of the blows on my head and I could not see, so he threw me back head first in the front seat of the car and sprawled over me so that I could not get away,

and he held me down like that and drove away. He drove for a long time holding me down, I didn't see where we were going, it was up in the hills somewhere. He stopped at the top of the hill where it was deserted, no cars or anything. I sat talking to him, I didn't know what he intended to do, I appealed to his nobility, asking him to take me home, I told him I had a mother and that I didn't go in for such things, and he laughed at me for a while, put his arm around me and ordered me to take off my clothes. Meanwhile he was—

"Mr. Lavine (Defense Counsel who appeared for the defendant only at the preliminary examination and did not represent him at the trial): What happened to your clothes? Who took them off?

"A. While we were fighting the buttons were all ripped off and there wasn't much to take off, just slipped off, he took them off, told me to get out and get in the back seat with him.

"Mr. Lavine: Did you slip your clothes off?

"A. No, he did. My hand was broken, I had to get out of the way, I could no longer object to anything he did do, I had no defense.

" . . .

"Q. . . . Did he insert his penis in you?

"A. Yes.

"Q. In your vagina or in your rectum?

"A. (Witness points to the word vagina in the written question.) He started that and it didn't seem to satisfy him and after a few minutes he gave it up. . . .

"A. I resisted against it as well as I could and it seemed hours we struggled, with him trying it over and over again. He did not give it up until he succeeded in his purpose. . . .

" . . .

"A. After he raped me he let me dress again and asked me where I lived. I didn't want to tell him where I lived because it was on a dark street, and I didn't know what else he would do, and I told him I lived at a hotel on Main street because I knew there were cars and things out at that hour and I could get away from him, so he took me down there and was telling me that he would take me out on Christmas, and tried to make a date for then. He asked me what room and what floor I lived on, and my name, so he could send me the money, $25.00. While we were talking he said he was going in with me and I told him the hotel rules were against

it, he could not go in, and we were arguing about it and the radio cops came along and they stopped and looked in the window. I thought they were going to pass on and so I did not make any move until I found they were waiting down the street a little ways, and then I made a jump for it. . . . and I was trying to tell the police what happened and he turned around behind them and drove away. I was taken to the hospital. . . .

"Q. Did you kick him at any time?

"A. I did when I fell out of the car the first time, when he was getting out then on top of me. I thought I kicked him in the face, I was not sure.

"Q. Did you at any other time?

"A. That was all.

"Q. Did you kick him at any other time?

"A. I don't think so.

"Q. Did you scratch him at any time?

"A. Oh, his face was scratched afterwards, but I don't know whether it was from kicking him or scratching him or what it was while I was fighting with him.

"Q. You don't know then whether you scratched him or not?

"A. He had cuts on his forehead that were bleeding, but I don't know if it was a scratch or a kick. He may have got them on the pavement when he fell out and when I fell and he was trying to pull my hair out and when my hair came loose it broke the fall. . . .

" . . . Q. By Mr. Lavine: But you kept your legs spread apart all the time he was doing that? . . .

" . . . A. . . . I was fighting with him all the time, whether they stayed that way or not I could not say."

The radio patrol officers testified that on the morning of December 13 about 5 o'clock they saw the prosecutrix standing beside a green sedan parked on Main street about 40 feet south on Seventh street. To them it appeared that she and the occupant of the car were engaged in an argument. The officers cruised past the parked automobile about 30 yards or so, when they observed the prosecutrix running after them. They stopped the police car and awaited her approach. Her hair was mussed up, she was crying and hysterical, her lip was cut, and she was holding her left hand. The officers discovered several large locks of her hair were loose, and as one of the officers testified, "I took hold of it, and I could pull

large locks of hair out.'' To the officers the prosecutrix made a complaint, but by that time the car in which defendant was riding had disappeared, and the police officers took the prosecutrix to the receiving hospital, where the attending physician examined her at about 5:45 a. m. Her clothing was dirty and disheveled; she was crying and complaining of her back. There was a contusion on the right side of her head above and behind the ear. She also had a contusion and abrasion in the region of the middle of her backbone, which was bleeding at the time of the examination. There was a contusion on the back of her right hand, which was swollen. A vaginal smear was made, examination of which indicated spermatozoa upon it.

Defendant was not apprehended for several months after the alleged offenses were committed, and on January 15, 1940, he addressed a letter, bearing a Canadian stamp and postmarked, ''Little Forks, a. m., Jan. 15, 1940, B. C.'' This letter was addressed to the proprietor of the Friars Club, and read in part: ''How is the hot shot? Well, is the heat still on or has it started to cool off in L. A.? Here is a little surprise for you. I am in the army now and it won't be long before I am over hunting down a few squareheads. . . . Say hello to all the coppers for me and tell them to take a vacation and come on over but be sure they don't get in front of me when I am firing at the squareheads. . . . ''

Appellant admitted having an act of sexual intercourse with the prosecutrix, but testified that the same was with her consent. He also testified that after he accomplished the sexual act she wanted pay, and when he refused she started to cut the upholstery of his car with a penknife, and that when he attempted to restrain her a scuffle ensued. He was arrested by the Federal Bureau of Investigation in March, 1940, at a mine about 2 miles above Kernville, California, where he had been, according to his testimony, since December 14, 1939, and while at the mine he used the *alias* of Roy Martin. Defendant admitted that after his arrest he told the investigating officers he was not in Los Angeles on the date when the prosecutrix stated she was assaulted; that he had never seen the prosecutrix, and denied writing the letter above referred to.

We have set forth the evidence in some detail because as his first ground of appeal it is earnestly urged by appel-

lant that the *corpus delicti* of the charge of forcible rape was not proved, in that the evidence shows that the prosecutrix did not resist and that the use of force and violence by the accused is not established by the testimony. We have no hesitancy in saying that the evidence herein narrated certainly shows that the victim resisted with all reasonable means. The battered and bruised condition of her body, as testified to by herself and corroborated by the police officers and receiving hospital doctor, gives mute evidence not only that she most vehemently exercised the physical means at her command to resist the assault upon her by appellant, but also that no small degree of force and violence was used upon her. In the face of the evidence in the case at bar it would severely tax one's credulity to say that by her conduct the prosecutrix did not make non-consent and actual resistance reasonably manifest. We find ourselves in accord with the views expressed in the classical language of the Supreme Court of Idaho in the case of *State* v. *Neil,* 13 Idaho, 539 [90 Pac. 860, 91 Pac. 318], which we herewith quote:

"A number of authorities are cited by counsel for appellant, to the effect that the state must show in such cases that the female 'showed the utmost reluctance and used the utmost resistance'. (*Devoy* v. *State,* 122 Wis. 148 [99 N. W. 455].) To our minds the trouble with a number of these authorities is that they reverse the order of the inquiry. They go about inquiring into the kind, character and nature of the fight put up by the woman, rather than the nature of the assault and evident and manifest purpose and intent of the assailant. For the purpose of reaching the conclusions announced in some of these cases, it is necessary to assume that, in the first place, a man has a right to approach a woman, lay hold on her person, take indecent liberties with her, and that, unless she 'kicks, bites, scratches and screams' (*People* v. *Morrison,* 1 Park. Cr. R. [N. Y.] 625), to the 'utmost of her power and ability', she will be deemed to have consented, and indeed to have invited the familiarity. Such is neither justice, law, nor sound reason. . . . It is true that she (the prosecutrix) must not have consented, because, if she did, there would be no offense; but, on the other hand, men should not be allowed, under the protection of law, to construe every indiscreet act or word of a woman into consent to carnal knowledge, nor should they be allowed to indulge in presumptions against the virtue

and chastity of women. Rather let the evil-minded man incur the risk and hazard of misjudging the opposite sex, and endeavoring to degrade them and destroy their peace and happiness. A little of this kind of law would go a long way with some of the brutes who unfortunately bear the names of men. There would be far less illicit intercourse, if there were no assaults by the seducer in the first place; and the oftener he is brought to justice the less annoyance the community will suffer from the graver offenses toward which his conduct leads.''

 The fact that the jury may have believed that when at intervals throughout her harrowing experience the prosecutrix remained calm and collected, she was acting upon the honest belief that she could thereby best extricate herself from the predicament by relying on her wits rather than making an attempt to escape or give utterance to an outcry at the risk of being further assaulted and injured, affords no ground for reversing the judgment, when, as heretofore pointed out, there was every evidence of a *bona fide* and genuine resistance on her part. The sincerity and genuineness, as well as the extent, of the resistance or nonconsent are questions addressed solely to the jury. An appellate tribunal cannot disturb the findings of the triers of fact unless it be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence, circumstantial or otherwise, to support the conclusion reached in the lower court. (*People* v. *Newland,* 15 Cal. (2d) 678 [104 Pac. (2d) 778]; *People* v. *Gidney,* 10 Cal. (2d) 138, 143, 144 [73 Pac. (2d) 1186].) No such showing is made in the instant case. True, there is an irreconcilable conflict between the testimony of the prosecutrix and that given by the defendant. However, our appellate jurisdiction extends only to questions of law, and where the evidence which militates against the defendant, considered by itself and without regard to conflicting evidence, is sufficient to support the verdict, the question ceases to be one of law—of which alone this court has jurisdiction—and becomes one of fact upon which the decision of the jury and the trial court is final and conclusive.

 It is next contended that the information is defective so far as count I thereof is concerned, because it is not alleged that the prosecutrix was abducted ''with a design to take (her) out of the state'', and that for the same reason an

instruction given by the trial judge omitting the phrase just quoted was erroneous and prejudicial. Without doubt, when in 1890 the case of *Ex parte Keil,* 85 Cal. 309 [24 Pac. 742], relied upon by appellant, was decided, section 207 of the Penal Code did require that the forcible taking of a person must be under circumstances which involved a design to take the victim out of this state or from one county to another in this state; but in 1905 the legislature amended the section by adding thereto the words "or into another part of the same county". Under the amendment just quoted it is plain that among the several offenses or acts intended to be described by the legislature as constituting kidnaping there was included the forcible taking or stealing of a person and carrying him or her into "another part of the same county". It is not now required that there be an intent or design to carry the kidnaped person out of the state or from one county into another. It is sufficient if the taking is with the intent and purpose to transport the person to another part of the county in which the abduction takes place. (*People* v. *Fernandes,* 127 Cal. App. 45 [15 Pac. (2d) 172].) The information herein clearly charged an offense under section 207 of the Penal Code; and the instruction given in connection with the issue thus framed was proper.

Appellant insists, however, that the evidence is insufficient to sustain a conviction of any form of kidnaping. Let us assume, as contended by appellant, that the victim, notwithstanding her denial thereof, did in fact voluntarily get into appellant's automobile and accompany him from the Friars Club along with "Leo", the driver of the automobile; nevertheless, there is very substantial evidence in the narrative heretofore in this opinion set forth to justify the jury in concluding that she did not go with him voluntarily when they left the Caliente Club shortly before 2 a. m., at which place, according to her testimony, she became apprehensive of appellant's intentions and purposes toward her and attempted to get out of his automobile, when he forcibly restrained her, drove her into the hills and ravished her. It must be conceded that the testimony of the victim, if capable of belief, is sufficient to support the verdicts; but it is urged that her testimony, when taken in conjunction with her conduct and behavior, must be held by this court to be so inherently incredible as to amount to no evidence at all, and that the verdicts

were the result of passion and prejudice, rather than a calm and impartial judgment resulting from a dispassionate consideration of the evidence. ■ Before we are authorized to say that the testimony of the prosecutrix herein bears upon its face the brand of inherent improbability and is unbelievable *per se,* we must be warranted in concluding that what she testified to would seem impossible to have taken place under the circumstances described by her. This we cannot do, and hence must conclude, under well-established rules governing the prerogatives of the jury in the matter of determining questions of fact, that the verdicts are supported by the evidence.

■ Finally, appellant urges that the trial court committed prejudicial error in the giving and rejection of certain instructions. In view of what we have herein said, it follows that in this complaint appellant cannot be upheld. Reading the instructions as a whole, we conclude that they fairly and correctly advised the jury of the kind, quality and *quantum* of evidence required to justify a guilty verdict on either the kidnaping or rape charges.

For the reasons herein stated the judgment and the order denying defendant's motion for a new trial are, and each is, affirmed.

York, P. J., and Doran, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 5, 1940.