[Crim. No. 2034.   Third Dist.   Mar. 31, 1948.]

THE PEOPLE, Respondent, v. WARREN L. HADLEY, SR., Appellant.

J. T. Fraser and J. Thomas Fraser, Jr., for Appellant.

Fred N. Howser, Attorney General, and Benjamin B. Knight, Deputy Attorney General, for Respondent.

PEEK, J.—The defendant was convicted of the crime of murder in the second degree, and has appealed from the judgment and the order of the trial court denying his motion for a new trial.

Inasmuch as one of the grounds for reversal urged by appellant is the alleged insufficiency of the evidence we have reviewed in detail the facts of the case, as we must, in the light most favorable to the verdict of the jury.

At the time of the homicide defendant was approximately 79 years of age and was living on an undeveloped ranch owned by his son, the decedent, in Humboldt County. An old cabin on the ranch had been repaired by the son in order that the defendant might have a place to live, but the manner in which the repairs were made appeared to have greatly displeased the defendant and it was a continuing source of argument between them. Prior to moving to decedent's ranch defendant had made his home on a ranch jointly owned by a daughter, another son and their spouses, but had left there in August, 1946, because of a quarrel with his daughter, likewise resulting from his dissatisfaction with the arrangements there.

On December 28, 1946, the decedent, his son Herbert Jr., aged 9, and Mr. Rodoni, decedent's father-in-law, drove to the ranch from their home in San Francisco. After supper that evening the three men, defendant, decedent and Mr. Rodoni played pinochle, during the course of which defendant became dissatisfied with decedent's playing and later

accused him of cheating. Nothing of importance appears in the record until the day of the homicide, January 2, 1947. On that morning appellant arose first and prepared his own breakfast. He appeared to be morose and unfriendly, refusing to reply to a "good morning" from Rodoni and the decedent as each arose. As a result of his attitude a further argument began between him and the decedent concerning which Rodoni testified in substance as follows:

That when the defendant refused to speak to his son, the decedent said he wanted to talk to him, and defendant in reply said, "What the hell you want to talk about now?"; that decedent said he wanted to know what was wrong, why was it that after he had been at the ranch for a day or two the defendant would talk to no one but would only grunt, whereupon the defendant called him a "damn liar."

Mr. Rodoni, believing it to be just a family quarrel went outside, leaving them alone in the cabin. While outside he heard them argue over various matters including the pinochle game, the repairing of the cabin and a fight in Oregon in which decedent had been defeated, all of which was corroborated by the defendant himself, and partially by the 9-year-old son of decedent, who at the time was in bed in the cabin. Rodoni further stated he heard defendant threaten to kill the decedent. The boy also testified to a similar threat by the defendant.

Although Rodoni testified he saw no fighting, or marks upon the defendant, nor did he hear sounds of a fight, the young boy and defendant both described the scuffle which took place while Rodoni was outside the cabin and during which blows were struck by both men. The arresting officers further corroborated defendant's testimony concerning the condition of his face and clothes as an indication of a struggle.

After the scuffle or fight appellant went outside, washed his face, returned, and continued to argue with the decedent who insisted that appellant quit calling him a liar. The appellant, however, persisted in his verbal attack, and his vexatious and defiant attitude is reflected in his own testimony at the trial: "And I never had any idea of quit calling him a liar as long as I know he was a liar." The appellant's state of mind is further illustrated by his statements to Constable Drewert a few hours after the shooting, when in reply to the constable's question: "did you shoot to kill" referring to the second and third shots, defendant replied, "you're God damned right I did." Likewise his statement

that the last words he spoke to decedent were "You are a damn dirty liar."

As the last statement was made the decedent was at the opposite end of the cabin, about 24 feet from appellant and had started toward him. Appellant, who was the only witness to testify to the entire shooting, took a loaded 30-30 caliber rifle from the wall behind him, as he stated, for the purpose of stopping decedent, fired, hitting him in the left shoulder. After the first shot decedent either was knocked down or had moved about 8 feet and "right side up" as appellant testified; decedent was crouched down, giving defendant the impression he was going to spring at him. Defendant then fired the second shot, the bullet ranging downward through the decedent's upper right leg, causing him to fall on his face immediately in front of defendant. The third shot was fired into decedent's back as he lay on the floor. The reason stated by defendant for firing the third shot was that when decedent had dived as the second shot was fired he had grabbed defendant's left heel, and feeling that decedent would kill him if he could, the instant his heel was grabbed, the defendant shot. Immediately prior to the shooting Mr. Rodoni had returned inside the cabin and was busy getting the boy up, with his back toward defendant and decedent and did not see the first two shots fired. However, he and the decedent's son saw the final shot fired.

As one of the grounds urged for reversal of the judgment, appellant contends that "the verdict is contrary to the evidence," and characterizes the testimony of Mr. Rodoni and the decedent's son as incredible and unworthy of belief. The appellant recognizes the rule that if there is substantial conflict in the evidence which cannot upon its face be said to be wholly improbable or unbelievable, the verdict of the jury will not be disturbed on appeal (*People* v. *Ogden,* 41 Cal.App.2d 447 [107 P.2d 50]), but attempts to circumvent the rule by the assertion, as stated, that the testimony of Mr. Rodoni and decedent's son is incredible, and therefore constitutes no evidence. However, it is equally well settled that the credibility of witnesses and the right to draw inferences from the evidence are questions peculiarly within the province of the jury. (*People* v. *Tedesco,* 1 Cal. 2d 211 [34 P.2d 467]; *People* v. *Perkins,* 8 Cal.2d 502 [66 P.2d 631]; *People* v. *Haydon,* 18 Cal.App. 543 [123 P. 1102, 1114].) It is only where the evidence relied upon to sustain

the conviction is physically impossible or so inherently improbable as to be impossible of belief that an appellate court will give to it an effect of no evidence at all. (*People* v. *Headlee,* 18 Cal.2d 266 [115 P.2d 427]; *People* v. *Braun,* 14 Cal. 2d 1 [92 P.2d 402]; *People* v. *Haydon, supra.*)

■ The testimony of the two witnesses is in no way unbelievable but merely relates to facts surrounding the shooting which are entirely consistent with the fact of the homicide. The appellant's argument is that Rodoni's testimony that he heard no fighting or saw no evidence of blows on defendant's face is in direct conflict with that of decedent's young son and of the police officer who testified to the condition of defendant's face and clothes, and that a father, sane and in his right mind, would not kill his own "flesh and blood" deliberately and without sufficient provocation to invoke a belief in the necessity of self-defense, and that any other view of the facts is inherently improbable. It is obvious that the first point argued presents merely a conflict in the evidence, and as regards the second point, the all too many cases involving just such a tragedy as here occurred, sufficiently bear witness to the frailty of human nature which makes such an unfortunate act possible.

■ As an additional ground for reversal the appellant urges that certain misconduct on the part of the district attorney, which he charges was part of a deliberate plan, operated to the prejudice of the appellant by inducing the jury to return a verdict based on bias and prejudice.

The misconduct complained of consisted of references to an estrangement between defendant and his family and his desertion of them some 20 years prior to the homicide. Such domestic difficulties were first brought to the attention of the jury in the district attorney's opening statement and again referred to in his closing argument. The charge of desertion was hinted by a son of defendant, the witness Warren Hadley Jr., when in an unresponsive answer he stated: "I hadn't seen him to remember him since I was six years of age", and directly mentioned in the testimony of defendant's daughter who, also in an unresponsive answer, stated: "I think I was twelve years old when he deserted all of us." Counsel for defendant made no objection to this testimony except to move that the latter statement be stricken on the ground that it was incompetent, which motion was granted and the jury instructed to disregard it.

Appellant also charges error of a similar nature was committed by the admission of certain testimony by these same two witnesses in which they recite benevolences to their father, the defendant. Although no objection was made thereto at the trial it is now claimed that such testimony reflected upon the defendant as being an ungrateful father, and was improperly admitted.

Further error is alleged in the testimony by the wife of decedent regarding an argument between defendant and his daughter, at which the witness and decedent were present in that after an objection to the examination of the witness concerning the facts of this argument had been sustained, the district attorney in disregard of the ruling continued: "Q. Did he (decedent) participate in any way in the argument? A. Not in the argument, but when the old man picked up a rock to hit his daughter, why, he went. . . ." The court interrupted the witness at that point and again ruled the testimony to be inadmissible.

Finally, appellant cites as prejudicial misconduct the derogatory remark of the district attorney with reference to the defense counsel that "just because he (defendant's counsel) is in the habit of coaching witnesses and telling them what to say is no reason to presume what other people do."

There is no doubt that the introduction, deliberate or not, of such statements into the case was improper as were the remarks directed at defendant's counsel.

The prosecution in order to convict the defendant may not introduce evidence of other offenses or bring before the jury facts concerning wrongful acts for the purpose of showing that he is of bad character and more likely to have committed the offense than if he had been of a better moral disposition. (*People* v. *Zemanvasky,* 20 Cal.2d 56 [123 P.2d 478]; *People* v. *Cook,* 148 Cal. 334 [83 P. 43]; *People* v. *Mohr,* 157 Cal. 732 [109 P. 476]; *People* v. *Glass,* 158 Cal. 650 [112 P. 281].)

The fact that some of the remarks were not objected to at the trial does not necessarily preclude the appellant from urging their prejudicial effect for the first time on appeal, if it can be said they were sufficient to cause a possible miscarriage of justice. (*People* v. *Podwys,* 6 Cal.App. 2d 71, 75 [44 P.2d 377]; *People* v. *Lynch,* 60 Cal.App.2d 133 [140 P.2d 418].)

In determining the prejudicial effect of errors occurring in the trial of a case an appellate court, by the mandate of article VI, section 4½ of the California Constitution, must review the entire case for the purpose of determining whether a miscarriage of justice has resulted or the ends of justice subserved. It is only " 'in a close case where the evidence is sharply conflicting, substantial and serious errors vital to defendant that may have resulted in a miscarriage of justice must be regarded as prejudicial and grounds for reversal.' " (*People* v. *Reese,* 65 Cal.App. 2d 329, 337 [150 P.2d 571].)

In the instant case the testimony of the defendant himself is so strongly indicative of his cantankerous and belligerent attitude to the bitter end that the instances above referred to hardly can be viewed as having increased any prejudice in the minds of the jurors which may have existed along that line.

Moreover, a review of the entire record does not indicate the case to be so close it could be said the errors of which defendant complains were of such a degree as to have turned the scales against him, and therefore without such errors the jury would have been likely to have returned a verdict in his favor.

The judgment and order appealed from are affirmed.

Adams, P. J., and Thompson, J., concurred.