Filed 5/4/22  In re Williams CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re WILLIAM BLAINE WILLIAMS<br><br>on Habeas Corpus. | G059250<br><br>(Super. Ct. Nos. 98NF0866,<br>M-17552, M-18372)<br><br>O P I N I O N |

Original proceeding on a petition for writ of habeas corpus.  Relief granted.

Erica Gambale, under appointment by the Court of Appeal, for Petitioner.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Natasha Cortina, Acting Assistant Attorney General, Daniel Rogers and Lise S. Jacobson, Deputy Attorneys General, for Respondent.

\*          \*          \*

"A person unlawfully imprisoned or restrained of their liberty . . . may prosecute a writ of habeas corpus to inquire into *the cause* of the imprisonment or restraint." (Pen. Code, § 1473, subd. (a), italics added.)[1] A person may prosecute a writ when: "New evidence exists . . . of such decisive force and value that it would have more likely than not changed the outcome *at trial*." (§ 1473, subd. (b)(3)(A), italics added.)

In 1999, William Blaine Williams was sentenced to 25 years to life under the former "Three Strikes" law, based on nonviolent drug convictions. Williams filed petitions for resentencing in 2013 (Proposition 36) and 2014 (Proposition 47).

In 2016, the trial court presided over a consolidated evidentiary hearing. During the hearing, the district attorney presented evidence Williams had stabbed his fellow inmate Edward Rose on July 20, 2010. The court denied Williams' petitions for resentencing because the court found he "would pose an unreasonable risk of danger to public safety." (See §§ 1170.126, subd. (f), 1170.18, subd. (b).)

In 2021, Williams filed a supplemental petition for a writ of habeas corpus in this court. In a signed declaration, Rose averred under penalty of perjury: "I am certain that Mr. Williams was not the person who stabbed me on July 20, 2010."

Although this is a close call, we find Rose's declaration "would have more likely than not changed the outcome" at the 2016 evidentiary hearing. The denials of Williams' resentencing petitions are essentially *the cause* of his continued restraint; therefore, a writ of habeas corpus is an appropriate form of relief. Further, under these circumstances, an evidentiary hearing is equivalent to a "trial" under section 1473.

Thus, we order the trial court to vacate its 2016 rulings and to conduct a new evidentiary hearing regarding Williams' petitions for resentencing.

---

[1] Further undesignated statutory references are to the Penal Code.

# I

## FACTS AND PROCEDURAL BACKGROUND

In 1999, Williams was convicted of possessing heroin and cocaine. Williams had three "prison" priors and eight "strike" priors. The court imposed a total aggregate sentence of 25 years to life.

In 2013, Williams filed a petition for resentencing under section 1170.126 (Proposition 36). Generally, Proposition 36 allows a person to file a petition for resentencing if he or she is currently serving a life sentence based on a "third strike" for a nonserious or nonviolent felony. (§ 1170.126.)

In 2014, Williams filed a petition for resentencing under section 1170.18 (Proposition 47). Generally, Proposition 47 allows a person to file a petition for resentencing if he or she is currently serving a sentence for a felony, which could now be charged as a misdemeanor under current law. (§ 1170.18.)

In 2016, the trial court conducted a consolidated evidentiary hearing to determine if Williams "would pose an unreasonable risk of danger to public safety." (§§ 1170.126, subd. (f), 1170.18, subd. (b).) During the hearing, the district attorney introduced California Department of Corrections and Rehabilitation (CDCR) documents, which included records about the 2010 stabbing of Rose. In 2011, a prison official had found Williams guilty of attempting to murder Rose based on the written statements of three prison guards (the local prosecutor declined to prosecute).[2]

At the conclusion of the 2016 hearing, the trial court denied Williams' resentencing petitions. The court found that the statements of the prison guards "are sufficient to show that Mr. Williams did, in fact, stab another inmate at that time. Now, the reason why he stabbed him? We have no idea. There is no testimony in this case concerning that. There were no prior statements by the defendant about that since he

---

[2] The 2010 stabbing will be discussed in detail in the discussion section of this opinion.

basically denied that he did it. [¶] But there were also no other witnesses at all which would indicate that the statements by the correctional officers are either suspect or should not be believed. There was nothing that impeached anything that those two officers had to say about what they observed take place."

In 2017, this court affirmed the trial court's order. (*People v. Williams* (Dec. 22, 2017, G053450) [nonpub. opn.].) This court held that under an abuse of discretion standard of review, "we are required to affirm the trial court's finding that Williams poses a danger to public safety based on a 2010 prison stabbing incident in which Williams allegedly stabbed another inmate. Even so, it's a closer case than just that description might suggest." (*Ibid*.) This court noted that "the disciplinary record shows that the prison guard who saw Williams stab the other inmate saw him stab the victim with his right hand. Williams, however, is left handed" (*Ibid*.) Nevertheless, given the deferential standard of review, this court concluded: "There is nothing we can do for him. The trial court's order is affirmed."

In July 2020, Williams filed a petition for a writ of habeas corpus in this court on the grounds of new evidence. The petition included a declaration from Rose. This court requested informal briefing and appointed counsel for Williams.

In October 2020, the Board of Parole Hearings (the Board) denied Williams' request for parole. One of the Board members told Williams: "you minimize your violence in 2010." "I know you deny the . . . incident in 2010 and we got the statement from the victim, but it's, you know, you're found guilty of it."

In August 2021, Williams filed a supplemental petition for a writ of habeas corpus. The petition included an updated declaration from Rose.[3] This court issued an order to show cause.

---

[3] The 2021 declaration will be discussed in detail in the discussion section of this opinion.

4

DISCUSSION

Williams argues the Rose declarations would have more likely than not changed the outcome of the 2016 consolidated evidentiary hearing (the denial of the two resentencing petitions) had the new evidence been available to the trial court. We agree.

In this discussion, we will: A) review general principles of law; B) summarize the relevant evidence; and C) analyze the law as applied to the facts.

## A. General Principles of Law

A person may prosecute a writ of habeas corpus when: "New evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial." (§ 1473, subd. (b)(3)(A).) "For purposes of this section, 'new evidence' means evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching." (§ 1473, subd. (b)(3)(B).)

## B. Relevant Evidence

The relevant evidence in this case concerns: 1) the 2010 stabbing, in which a prison official found Williams responsible for Rose's stabbing; and 2) the subsequent declarations by Rose, who now states Williams was not the person who stabbed him.[4]

### 1. The 2010 Stabbing

Correctional Officer E. Lugo wrote a Rules Violation Report (RVR) noting: "On Tuesday, July 20, 2010, at approximately 1752 hours, while . . . locking up inmates

---

[4] We have corrected minor grammatical errors throughout for purposes of readability.

returning from the evening meal, I heard a loud noise in Upper C-section by cells 235 and 236.  I looked over to that area, I saw inmate WILLIAMS . . . strike inmate [ROSE] in the upper chest area twice, with what appeared to be his fist, in front of cells D2-235 and 236.  I ordered all inmates to get down, via the Public Address System, and activated my personal alarm.  Inmate [ROSE] ran from the area towards cell 248 grabbing his chest with his right hand and fell in front of cell D2-248.  Inmate WILLIAMS assumed a prone position on the floor in front of 235.  I immediately secured all open cell doors."

Correctional Officer J. Lopez wrote a Crime/Incident report:  "On July 20, 2010, . . . I was observing inmates returning back from evening meal, when I heard a scuffled noise from in between cells 235 and 236.  I observed an inmate later identified as inmate [ROSE] running towards cell 248.  I also saw inmate later identified as WILLIAMS . . . , make a throwing motion toward inmate [ROSE] and a few seconds later, I heard a metal to metal noise immediately yelling 'everybody down.'  While I was proceeding to 'C' Section stairs, I ordered inmate [ROSE] to get down and not to go inside the cell.  I then ordered inmate WILLIAMS to get down, and he complied.  When I got to inmate [ROSE] I observed what appeared to be blood on his left shoulder.  I informed via the institutional radio that I needed medical staff to respond . . . .  I informed C/O Trejo to cuff inmate WILLIAMS.  At that time, I informed responding staff that a inmate manufactured weapon was probably used:  Sergeant Smith responded to my position, that's when we noticed a second puncture wound . . . ."

Correctional Officer M. Sandoval wrote a Crime/Incident report stating he responded to the radio call and:  "Upon arrival I saw inmate Williams . . . , and inmate [ROSE] laying out in a prone position in upper C-Section Floor.  I then heard Officer J. Lopez state, 'Look for a weapon.  I heard a weapon being thrown inside a cell.'  I immediately started to look by the corner trash can in between cell #233 and cell #234.  I had . . . Officer E. Lugo open the empty cells from 234 to cell 240.  When Officer Lugo

6

opened cell 240, I found one (1) inmate manufactured weapon made of flat metal stock, sharpened to a point on one end and a handle on the opposite end, fashioned from white pieces of altered linen. The inmate manufactured weapon was located on the side of the stainless toilet furthest from the cell door."

On May 27, 2011, Senior Hearing Officer (SHO) Correctional Lieutenant W. Newman conducted a disciplinary hearing regarding the RVR report. Newman wrote a subsequent report noting: "On July 29, 2010, inmate WILLIAMS requested postponement of the hearing pending resolution of criminal prosecution. On 4/4/11 notice was received from the . . . Imperial County District Attorney's Office that these charges had been rejected by the Imperial County Superior Court."

In May 2011, prior to the CDCR disciplinary hearing, Williams was permitted to submit written questions to the witnesses.

Williams asked Officer Lugo: "At the onset of the incident of July 20, 2010, . . . approximately how many cell doors were open in the Unit; specifically in 'C' section, Upper and Lower Tiers?" Lugo responded "I don't remember." Williams asked: "Did anyone, to your knowledge make a map, diagram or even a list of prisoners who were on the floor at the time of the incident?" Lugo responded: "Not that I am aware of." Williams asked: "In your report you state that you observed me 'strike' inmate [ROSE] in the 'Upper left chest area, twice, with what appeared to be a closed fist'—with this in mind . . . . When the alleged 'striking' occurred was I positioned in front, behind, left or right side of prisoner [ROSE?]" Lugo responded: "You were positioned directly behind inmate [ROSE] right side & your left arm was around [ROSE'S] waist." Williams asked: "Did I strike him with my right or left fist?" Lugo responded: "I saw you strike inmate [ROSE] with your right hand."

Williams asked Officer Lopez: "In your supplemental report you state that you 'heard' a scuffling noise between D2-235 and 36, so, in essence you viewed the

7

incident from the beginning?" Lopez responded: "No." Williams also asked, "how, in your opinion, was the weapon that was used in this assault, that you inferred I threw, come to rest between the wall and the toilet in my assigned cell, 240? As per C/O Lugo's report, the doors were secured so this weapon would have virtually had to make an S-Turn in the air for it to come to rest where it was discovered. Again, with your experience can you please give a viable explanation how this could happen?" This question, and many other questions, were deemed irrelevant by the SHO.

Prior to the disciplinary hearing, Williams provided a lengthy handwritten statement: "Not Guilty; for a finding of guilt there has to be a 'preponderance' of evidence showing same which simply does not exist. The only facts that ring true and are on the guilt side of the scale are: 1) Inmate [ROSE] was stabbed and 2) I was on the same tier as [ROSE] albeit a good distance away. Anything beyond those (2) two facts is conjecture. The series of questions I submitted to the Investigative Employee (IE) that were, with the exception of one (1), deemed 'irrelevant' per the SHO, would unveil how ludicrous this RVR is. This completely baffles this writer as these questions are the foundation of the RVR: cause, effect, and procedure. Under [the California Code of Regulations] these are all relevant as these questions bring to the forefront why procedural error was so rampant. For the sake of time I will only list a few: 1) There was no list of prisoners that were in and/or around the area that I and/or the state could utilize as potential witnesses. 2) No one else was examined for cuts, scrapes, abrasions or blood trace when none was found on or around me. 3) There is no clarification at all in how this weapon came to rest inside of my assigned cell without a drop of blood in the area; meaning, . . . if I threw this weapon, it would have hit and left blood somewhere [if it] had just recently been in a chest cavity, without even trying to fathom how it turned in mid-air into a cell; my cell. 4) If C/O Lugo witnessed me do this heinous attack he would also have seen me throw this weapon. 5) I have been stabbed on two (2) separate

8

occasions, . . . and, by a large majority, a person does not know he's been stabbed, most think they were punched, unless he sees a weapon and, with that in mind, [ROSE] could have been stabbed almost anywhere from the chow hall to the Building and didn't realize it until after exertion (Climbing Stairs) he saw blood; panicked and ran, so again, it confounds the mind why nobody else was checked when I was negative. Lastly, for time and space as I could go on; the only witness who claims to have seen this attack, no other Officers or inmates, is C/O Lugo and my contention is C/O Lugo didn't see me lay a hand on [ROSE]. The basis for this assertion is one (1) of the minimal amount of questions the SHO let be asked and answered was how this attack happened . . . . I simply would never shoot, punch, slice or stab anyone with right hand as I am, and always have been, left handed. Again, not guilty of anything other than being on the tier." At the hearing, Williams provided another statement reiterating his earlier points and stating he was "willing to take a polygraph."

At the hearing, Lieutenant Newman concluded: "Based upon the preponderance of evidence presented at this hearing the SHO believes a finding of 'GUILTY' for 'ATTEMPTED MURDER' is supported." The court imposed 360 days of forfeiture of credits, and "recommendation that the appropriate Security Housing Unit (SHU) term be assessed."

### 2. The 2021 Declaration by Rose

Rose signed declarations in 2020 and 2021 (after the appointment of habeas counsel).[5] In the 2021 declaration, Rose stated:

"1. I am competent to testify as a witness in this matter and if I were called as a witness I would testify to the following from my own personal knowledge,

_____

[5] The 2020 and 2021 declarations are substantially the same; however, in the 2021 declaration Rose identified his alleged stabber.

9

information, and belief:

"2. I am incarcerated by the California Department of Corrections and my CDC number is E099051. I am currently housed in San Diego, California at the R.J. Donovan Correctional Facility.

"3. I currently suffer from terminal cancer.

"4. I was the victim of a stabbing while incarcerated at California State Prison Calipatria on July 20, 2010.

"5. Prior to that stabbing, I was frequently using narcotics while incarcerated. I had an extensive drug habit in custody. I purchased my drugs from another inmate who I knew as 'CJ.'

"6. At the time of that stabbing, I owed money to CJ to pay for heroin.

"7. On July 20, 2010, I was in a physical fight with CJ because of the fact that I owed him money for that heroin. This fight occurred in the sally port of my housing unit, D-2.

"8. At some point during that fight, I was stabbed.

"9. I hurried from the scene of that stabbing toward my cell, cell D2-248, believing I would be safe once there. While hurrying away, I passed inmate William Williams, CDCR number E093272.

"10. As I hurried toward my cell, I heard a prison guard, Officer Lugo, order all inmates to 'get down' and lay on the floor where they were.

"11. I am certain that I hurried past Mr. Williams *after* I was stabbed.

"12. I am certain Mr. Williams was not the person who stabbed me on July 20, 2010. Mr. Williams and I were and still are friends. We had no problems then and we have no problems now. Rather, I did have problems with the CJ, who provided me with the drugs.

"13. After the stabbing, I was taken to a hospital and underwent open heart

10

surgery. Officials from the prison arrived at the hospital to obtain a statement from me regarding the stabbing. These officials repeatedly told me they believed Mr. Williams was the person who stabbed me. But I told them that could not be true because I distinctly remember passing Mr. Williams after having been stabbed. They did not want to hear what I had to say. So, I refused to cooperate with their investigation. I told them I didn't remember anything about the incident. I told them I did not want to cooperate. In fact, I asked the doctor at the hospital to make those officials leave.

"14. My recovery from the open-heart surgery was difficult. I had a stroke and suffered other medical complications from this surgery. I was confined to a wheelchair. All the while, prison officials continued to bully me in an attempt to gain a statement from me implicating Mr. Williams in the stabbing. I refused to cooperate.

"15. Because I refused to cooperate and implicate Mr. Williams as the person who stabbed me, prison investigators assured me that I would remain in the Administrative Segregation until I had sufficient time to reconsider and 'recall' the correct events of the stabbing.

"16. True to their word, I was placed in disciplinary isolation in the 'SHU' for nine months, which I believe was a result of my failure to cooperate.

"17. I was in a very dark place after this incident. I continued to refuse to cooperate with prison officials. Eventually, I was told it was a 'done deal,' the case was closed, and that they 'knew' Mr. Williams stabbed me. I never cooperated with any investigation or provided the prison officials with a statement stating the truth, that I knew it was likely CJ who stabbed me and not Mr. Williams.

"18. I knew Mr. Williams was blamed for this stabbing. I also learned Mr. Williams spent time in Administrative Segregation as a result of this stabbing. Nevertheless, I continued to refuse to cooperate with the prison investigation. I felt bullied and coerced by prison officials. They only wanted a statement . . . that

11

corroborated their idea Mr. Williams committed the stabbing. When I refused to provide that statement, because that was not true, I was disciplined. I also refused to cooperate with any other part of their investigation.

"19. In 2011, I was contacted by the local District Attorney's Office as part of their investigation into the stabbing. They too were [investigating] Mr. Williams. Yet, I knew that Mr. Williams was not the person that stabbed me. Nevertheless, I still refused to cooperate.

"20. After this incident, I never made any attempt to contact Mr. Williams to tell him that the prison officials bullied me in an attempt to obtain a statement from me implicating him (Mr. Williams) in the stabbing. I also never attempted to contact Mr. Williams in order to provide him with any information regarding the circumstances of that stabbing or who I believe stabbed me. In fact, I never before disclosed the identity of the person that I believe stabbed me.

"21. In May of 2019, after I was transferred to the R.J. Donovan Correctional Facility in San Diego, California, I was contacted by prison officials asking if I would sign a 'Marriage Chrono' indicating I had no problems with inmate William Williams . . . . That is when I learned that Mr. Williams and I were now housed at the same location. I agreed to do so and did sign this 'Marriage Chrono.'

"22. Later in 2019, I saw Mr. Williams for the first time since that 2010 stabbing. It was then that I learned the true extent of his discipline as a result of that stabbing. This was the first time I ever communicated with anyone about the circumstances surrounding this stabbing. I explained to Mr. Williams for the first time the treatment I received from prison officials after I refused to implicate him in that stabbing. Mr. Williams was unaware of my actions and conduct after the stabbing until this conversation. He was unaware that I refused to implicate him during the prison's investigation in 2010. I informed Mr. Williams that I knew he did not participate in the

12

altercation and that I knew he was not the person who stabbed me in 2010. I also told Mr. Williams for the first time that I was willing to provide this information to a court if I needed to do so.

"23. I agreed to provide this declaration and cooperate with this investigation now despite the fact that I previously refused to cooperate with any [and] all attempts at investigating this stabbing because I believe Mr. Williams was wrongly disciplined and I believe he is suffering consequences for something he did not [do.] Indeed, I know the truth as I was the person stabbed in 2010. I further believe I must now cooperate because I believe the truth must be heard and that Mr. Williams must have a fair chance at obtaining release from prison.

"I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct."

## C. Analysis and Application

In this original habeas proceeding, Williams contends Rose's 2020 and 2021 declarations "would have more likely than not changed the outcome" at the 2016 resentencing hearing. (See § 1473, subd. (b)(3)(A).) We agree.

The phrase "more likely than not" is equivalent to "a 'preponderance of the evidence,'" the familiar burden of proof in civil proceedings. (See *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1205; see also CALCRIM No. 1191A ["Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true"].)

In evaluating whether it is more likely than not Rose's declarations would have changed the outcome of the 2016 resentencing hearing, we are to consider the overall "closeness" of the case. (See, e.g., *People v. Newson* (1951) 37 Cal.2d 34, 46

13

["When the case against a defendant is a close one, an error which otherwise would not be prejudicial may justify a new trial"].) A case will be considered close, for example, where it turns primarily on the credibility of witnesses. (*People v. St. Andrew* (1980) 101 Cal.App.3d 450, 464-465 ["The case is a close one, turning primarily upon the respective credibility of the two principal witnesses"].) An additional factor to consider is where the evidence is sharply conflicting. (*People v. Hadley* (1948) 84 Cal.App.2d 687, 693 ["It is only '"in a close case where the evidence is sharply conflicting, substantial and serious errors vital to defendant that may have resulted in a miscarriage of justice must be regarded as prejudicial and grounds for reversal"'"].)

Here, the evidence turns primarily on the credibility of Officer Lugo, who was the sole witness who allegedly saw Williams stab Rose. Based on his written statements, it is not possible to determine what kind of view Lugo had of Rose's stabbing. In his initial statement, which appears to have been written within four days of the stabbing, Lugo said he saw Williams "strike inmate [ROSE] in the upper left chest area twice, with what appeared to be his fist, in front of cells D2-235 and 236." That was the extent of Lugo's initial statement regarding the stabbing.

However, several months later, in response to Williams' written questions, Lugo added further details: "You were positioned directly behind Inmate [ROSE] right side & your left arm was around [ROSE'S] waist." It might reasonably be questioned whether the investigation was thorough enough when a trained witness leaves out a matter such as this, which would ordinarily be considered significant. Perhaps most importantly, Lugo stated Williams allegedly stabbed Rose with his right hand, which is incongruous with the unchallenged statements of Williams that he is lefthanded.

As far as the other two witnesses, Officer Lopez and Officer Sandoval, they did not see the actual stabbing. Lopez allegedly saw Williams "make a throwing motion toward inmate [ROSE]." Sandoval then allegedly found an "inmate manufactured

14

weapon" (i.e., a shiv) in Williams' cell, which "was located on the side of the stainless toilet furthest from the cell door." Again, it seems somewhat strange that an assailant, after just stabbing someone two times in the chest, would then throw that same weapon in the direction of the person he had just stabbed. Moreover, given Lopez's statement that the cell doors were locked and needed to be opened to conduct the search, it also seems odd that Sandoval would have recovered the shiv in Williams' own purportedly closed cell, on the side furthest from the door, with no blood on the weapon.

There is also a discrepancy between Officer Lugo and Officer Lopez as to what happened to the victim Rose immediately after the stabbing. According to Lugo: "Inmate [ROSE] ran from the area towards cell 248 grasping his chest with his right hand and *fell* in front of cell D2-248." (Italics added.) However, according to Lopez: "While I was proceeding to 'C' Section stairs, I *ordered inmate [ROSE] to get down* and not to go inside the cell." (Italics added.) Ordinarily, minor discrepancies among percipient witnesses are to be expected. But such discrepancies would appear to be decidedly unusual when it comes to trained officers.

Turning to Rose's 2021 declaration about the stabbing, it appears to substantially corroborate the accounts of Lugo, Lopez, and Williams, except for the identification of the stabber. That is, Rose puts Williams in the vicinity of the stabbing, which Williams admits. Rose also puts himself on the stairs leading to his cell after being stabbed, but before hearing "a prison guard, Officer Lugo, order all inmates to 'get down' and lay on the floor where they were." Rose's declaration also seems to be logical as to where the stabbing likely occurred. That is, it seems likely the assailant would have stabbed Rose in some other location within the prison (and likely during an altercation), rather than stabbing Rose within the direct view of Lugo.

The hearing report written by Lieutenant Newman is also somewhat discrepant with how charging decisions are made by local prosecutors. Newman stated:

15

"On 4/4/11 notice was received from the Imperial County District Attorney's Office that these charges *had been rejected by the . . . Imperial County Superior Court*." (Italics added.) Ordinarily, charging decisions are made solely by a prosecutor (the executive branch) and not "rejected" by the superior court (the judicial branch). Here, it is hard to fathom what is meant by Newman's statement. That is, it does not appear there was a preliminary hearing in which the charges were perhaps "rejected" by a magistrate. In any event, assuming the Imperial County District Attorney independently decided not to press charges, that is not at all surprising, given the paucity of physical evidence, the lack of a thorough investigation (e.g., a failure to identify and interview potential witnesses), and the contemporaneous failure of Rose to identify Williams as his assailant.

In sum, given the initial CDCR records of the stabbing, and Rose's recent declarations signed under penalty of perjury, it appears Williams may have been misidentified as the stabber in 2010.

Although a close call, we find that had Rose's declarations been available to the trial court in 2016, they would have more likely than not changed the outcome of that evidentiary hearing. Indeed, the trial court said, "I think really the biggest part of the case is the events in 2010 in prison." Thus, we are granting Williams habeas corpus relief by ordering the trial court to conduct a new resentencing hearing under the relevant provisions of Proposition 36 and Proposition 47. (See §§ 1170.126, 1170.18.) [6]

The Attorney General argues: 1) habeas corpus relief based on a claim of "new evidence" is only available to a person after a "trial," as opposed to an evidentiary hearing; 2) Williams did not present Rose's declarations in a timely fashion; 3) the new evidence (Rose's declarations) would likely not have changed the outcome of the 2016

_____

[6] We are mindful these statutes include "sunset" provisions. Nevertheless, we are ordering the habeas corpus relief requested by Williams. (See § 1484 [a habeas disposition can grant any relief "as the justice of the case may require"].)

16

consolidated evidentiary hearing; and 4) the denial of Williams' parole in 2020 renders habeas corpus relief unnecessary.

*1. The denial of Williams's Propositions 36 and 47 petitions are the "cause" of Williams's continued confinement; therefore, Williams is entitled to prosecute habeas corpus relief on the grounds of new evidence under section 1473.*

"A person unlawfully imprisoned or restrained of their liberty, under any pretense, may prosecute a writ of habeas corpus to inquire into *the cause* of the imprisonment or restraint."  (§ 1473, subd. (a).)

"A writ of habeas corpus may be prosecuted for, *but not limited to*, the following reasons:  [¶]  . . .  [¶]  (3)(A) New evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome *at trial*."  (§ 1473, subd. (b), italics added.)

"Words and phrases must be construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, must be construed according to such peculiar and appropriate meaning."  (§ 7, subd. (16).)

The denials of Williams' resentencing petitions are essentially *the cause* of his continued restraint; therefore, a writ of habeas corpus is the appropriate remedy by which Williams may seek relief.  (§ 1473., subd. (a), see, e.g., *In re Guiomar* (2016) 5 Cal.App.5th 265 [inmate permitted to prosecute writ of habeas corpus to challenge counsel's alleged ineffective assistance at Prop. 47 hearing].)

Generally, "'the words of a statute must be interpreted according to their common acceptation [citation], and also that 'where a word, having a technical as well as a popular meaning, is used in a statute, the courts will accord to it its popular

17

signification.'" (*Perrin v. Miller* (1917) 35 Cal.App. 129, 132.) "There can be no question that, applying the above rules of construction . . . , the 'common acceptation' and the 'popular signification' of the word 'trial' must be construed as referring to *a hearing* and determination of the issues of fact involved. To hold otherwise would be to give to the word a strained and technical meaning." (*Ibid.*, italics added.)

The word "trial" also has a broad connotation within the Penal Code. (See, e.g., § 190.4, subd. (d) [in a death penalty case, after a finding of guilt, a penalty "phase of the trial" occurs; see also §§ 1369 [a defendant has a right to a "trial by court or jury of the question of mental competency"]; 1026, subd. (a) [the law provides for a sanity "trial" when a defendant pleads not guilty by reason of insanity]; 2972, subd. (a)(1) [an alleged mentally disordered offender "has the right to a jury trial"].)

Here, we conclude that under these circumstances, the word "trial" as used in section 1473, subdivision (b)(3)(B), is synonymous with an evidentiary hearing under long standing precedent. (See *Perrin v. Miller*, *supra*, 35 Cal.App. at pp. 132-133.)

Moreover, the Legislature in the habeas statute used the italicized phrase: "A writ of habeas corpus may be prosecuted for, *but not limited to*, the following reasons . . . . " (§1473, subd. (b), italics added.) The listed reasons available to prosecute a writ of habeas corpus in the statute are therefore not exhaustive. (See *Major v. Silna* (2005) 134 Cal.App.4th 1485, 1495 ["The phrase 'including, but not limited to' is a term of enlargement, and signals the Legislature's intent that [a statute] applies to items not specifically listed in the provision"].)

Thus, we reject the Attorney General's argument. We find habeas corpus relief based on a claim of "new evidence" is available to Williams even though his continued restraint is the result of an evidentiary hearing, rather than a determination of guilt or innocence at a formal "trial."

18

*2. Williams presented the declarations when Rose provided them; therefore, Williams presented the new evidence without substantial delay.*

"A writ of habeas corpus may be prosecuted for, but not limited to, the following reasons: [¶] . . . [¶] (3)(A) New evidence exists that is credible, material, *presented without substantial delay*, and of such decisive force and value that it would have more likely than not changed the outcome at trial." (§ 1473, subd. (b), italics added.)

"Substantial delay is measured from the time the petitioner or counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim. If a petitioner fails to allege particulars from which we may determine when the petitioner or counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim, he or she has failed to carry the petitioner's burden of establishing that the claim was filed without substantial delay." (*In re Robbins* (1998) 18 Cal.4th 770, 787.)

Here, in the declarations provided by Williams in support of his petition for a writ of habeas corpus, Rose stated he refused to cooperate with any contemporaneous prison investigations into the 2010 stabbing. Rose stated under penalty of perjury that it was not until he happened to encounter Williams in 2019, at a different prison, that Rose learned of the extent of the disciplinary consequences to Williams regarding the stabbing. It was then that Rose agreed to provide Williams with a declaration exonerating him of the 2010 stabbing at Calipatria State Prison.

As measured from the time Williams knew, or reasonably should have known, Rose was prepared to write an exonerating declaration, we find Williams' habeas petition was presented "without substantial delay." (See § 1473, subd. (b)(3)(A).)

Thus, we reject the Attorney General's argument. We find Williams's petition for a writ of habeas corpus was timely filed under the circumstances.

19

*3. The new evidence presented by Williams likely would have changed the outcome of the 2016 evidentiary hearing because Rose's declarations were not "merely" corroborative, collateral or impeaching.*

For purposes of habeas corpus proceedings, "'new evidence' means evidence that has been discovered after trial . . . and is . . . not *merely* cumulative, corroborative, collateral, or impeaching." (§ 1473, subd. (b)(3)(B), italics added.)

The "merely cumulative, corroborative, collateral, or impeaching" element of the statutory definition of "new evidence" for habeas corpus petitions is similar to the considerations for excluding evidence under Evidence Code section 352. "Cross-examination is subject to restriction under Evidence Code section 352 if it is cumulative or if it constitutes impeachment on collateral issues." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 352.) "Because the prosecution intended to offer other evidence which would tend to prove the same facts, [the witness'] testimony was cumulative. But trial courts are not required to exclude all cumulative evidence and if evidence has substantial relevance to prove material facts which are hotly contested and central to the case, it is not '*merely cumulative*.'" (*People v. Lang* (1989) 49 Cal.3d 991, 1016, italics added, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)

A "trial court has discretion to exclude impeachment evidence, . . . if it is collateral, cumulative, confusing, or misleading." (*People v. Price* (1991) 1 Cal.4th 324, 412.) In this context, "impeach" means that the new evidence would tend to discredit the testimony of a prosecution witness who testified a trial. (*United States v. Atkinson* (E.D.N.C. 1977) 429 F.Supp. 880, 885 ["Newly discovered evidence that merely goes to impeach the credibility of a prosecution witness does not ordinarily warrant the granting of a new trial, [citations]; but in some circumstances the newly discovered evidence, although impeaching[,] is sufficiently important in the ascertainment of the truth and in the interests of justice that a new trial should be ordered"].)

20

Here, there is no dispute that Rose was stabbed in Calipatria State Prison on July 20, 2010. The only contested issue is the identity of the stabber. Therefore, any conflicting testimony regarding who stabbed Rose is not merely "collateral."

It is true Rose's declarations are "cumulative" and "corroborative" in a sense because they tend to bolster Williams' claim from the outset that he was not the stabber. The declarations are also "impeaching" in a sense because they tend to discredit Lugo's allegation that Williams stabbed Rose. However, the declarations are "sufficiently important in the ascertainment of the truth" that they are "not merely cumulative, corroborative, collateral, or impeaching." (See § 1473, subd. (b)(3)(B); *United States v. Atkinson*, *supra*, 429 F.Supp. at p. 885.)

Thus, we reject the Attorney General's argument. We find habeas corpus relief is available to Williams because it is likely the 2020 and 2021 Rose declarations would have changed the outcome of the 2016 evidentiary hearing.

*4. The Board's denial of Williams' parole in 2020 does not confine the trial court's discretion on remand as to whether Williams's resentencing would pose an unreasonable risk to public safety.*

Under Proposition 36, if the trial court determines that a petitioner is statutorily eligible for relief, "the petitioner shall be resentenced . . . unless the court, *in its discretion*, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f), italics added.)

Similarly, under Proposition 47, if the trial court determines a petitioner is statutorily eligible for relief, "the petitioner's felony sentence shall be recalled and the petitioner resentenced to a misdemeanor . . . unless the court, *in its discretion*, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety. (§ 1170.18, subd. (b), italics added.)

21

The Attorney General argues: "If Williams had satisfied section 1473, the remedy would be a new hearing on future dangerousness; a new hearing is unnecessary here in light of the parole board's recent denial of parole." (Boldfacing omitted.) We disagree. The Attorney General cites no legal authorities supporting his notion that the Board's 2020 denial of parole would somehow confine the trial court's discretion on remand in 2022 to either grant or deny Williams' petitions for resentencing.

In sum, we reject the Attorney General's various unpersuasive arguments and grant the habeas corpus relief requested by Williams.


III

DISPOSITION

We grant Williams habeas corpus relief. We order the trial court to vacate its 2016 rulings denying Williams' Proposition 36 and Proposition 47 resentencing petitions. We order the court to conduct a new consolidated evidentiary hearing.


MOORE, J.

I CONCUR:


GOETHALS, J.

22

BEDSWORTH, Acting P.J., dissenting:

I respectfully dissent. My colleagues have correctly read the law, and they have correctly applied it. But we disagree irreconcilably about the result of that process.

I write separately because I do not believe a statement by a still-incarcerated (and therefore vulnerable) elderly inmate that he allowed an innocent man to be punished and did nothing about it for over a decade because he was offended by the attitude of prison officials – a statement produced only after he found out he was now incarcerated in the same unit as the innocent man and had a conversation with him – and purportedly for no other reason than that he has now rather belatedly decided "the truth must be heard" would have more likely than not changed the outcome of this matter.

BEDSWORTH, ACTING P. J.

1